**James MESSER, Jr.,**
**Petitioner-Appellant,**

v.

**Ralph KEMP, Warden, Georgia**
**Diagnostic and Classification**
**Center, Respondent-Appellee.**

**No. 86–8506.**

United States Court of Appeals,
Eleventh Circuit.

Oct. 16, 1987.
Rehearing Denied Nov. 30, 1987.

Howard Manchel and Robert L. McGlasson, Atlanta, Ga., for petitioner-appellant.

Mary Beth Westmoreland and William B. Hill, Sr., Asst. Attys. Gen., Atlanta, Ga., for respondent-appellee.

Before RONEY, Chief Judge, GODBOLD, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK and EDMONDSON, Circuit Judges.

TJOFLAT, Circuit Judge:

## I.

### A.

On February 13, 1979, eight-year-old Rhonda Tanner of Cedartown, Georgia, did not return home after school. Her mother became worried and drove to the school to look for her. At the school, the principal told Mrs. Tanner that a man identifying himself as Rhonda's uncle had taken Rhonda home earlier in the afternoon, claiming that her father had been injured on the job and that her mother had asked him to pick her up after school. The police were notified that Rhonda was missing.

The next day, various family members conducted an extensive search for Rhonda. After one of the family members spotted Rhonda's coat lying in some bushes, she notified the police, who along with agents of the FBI and the Georgia Bureau of Investigation began to search the area. Later that afternoon, the search party discovered Rhonda's half-nude, blood-spattered body in a secluded, wooded area outside Cedartown.

That evening, investigators located petitioner, James Messer, Jr., Rhonda's uncle

by marriage. They told him that they were investigating the Rhonda Tanner case and that they wanted to ask him some questions. They suggested that the questioning take place at the local police station.[1] Petitioner indicated that he wanted to cooperate, and he and his wife accompanied the investigators to the police station, where he voluntarily gave them a statement.[2] Initially, petitioner denied killing Rhonda. When he was told of the fact that witnesses had implicated him in the crime, he broke down crying and confessed to the murder.[3]

Petitioner admitted going to the elementary school and, in order to secure Rhonda's release, telling the principal that Rhonda's father had been injured and that he had come to take her home. He said that he and Rhonda left the school and drove to a secluded, wooded area. He stopped the car, and they walked into the woods together. Shortly thereafter, he began to molest her. When she resisted, he stamped her face and kicked her head. Then, he took out his pocket knife and stabbed her repeatedly. Petitioner denied raping Rhonda but admitted to masturbating on her abdomen.[4]

### B.

On February 16, 1979, two days after petitioner's arrest, the Superior Court of Polk County, Georgia appointed two attorneys to represent him.[5] Petitioner waived

---

1. The investigators told petitioner that he was not under arrest and did not have to accompany them to the police station. At the same time, however, they read petitioner his *Miranda* rights.

2. Petitioner also executed a waiver form, authorizing the investigators to search his residence without a warrant.

3. During his confession, the investigators advised petitioner that he was under arrest and reminded him of his *Miranda* rights.

4. The facts of this case were related in greater detail by the Supreme Court of Georgia, in affirming petitioner's convictions and sentences on direct appeal, *see Messer v. State*, 247 Ga. 316, 276 S.E.2d 15, 17–19, *cert. denied*, 454 U.S. 882, 102 S.Ct. 367, 70 L.Ed.2d 193 (1981), and by

a panel of this court, in affirming the district court's denial of petitioner's first petition for writ of habeas corpus, *see Messer v. Kemp*, 760 F.2d 1080, 1082–86 (11th Cir.1985), *cert. denied*, 474 U.S. 1088, 106 S.Ct. 864, 88 L.Ed.2d 902 (1986).

5. The Honorable Dan Winn appointed petitioner's two attorneys, and presided over all of the proceedings conducted under both the original and superseding indictments lodged against petitioner. The attorneys were E. Lamar Gammage and Joe Anderson. The record does not indicate when petitioner requested the appointment of counsel or whether petitioner was indigent and therefore was entitled to counsel at state expense. We assume that petitioner was indigent even though he eventually hired an attorney to prosecute his defense. *See* text accompanying note 9.

a committal hearing,[6] and his case was presented to a Polk County grand jury.[7] On February 26, 1979, the grand jury indicted petitioner on two counts, for kidnapping with bodily injury and for the murder of Rhonda Tanner.

A few hours before the indictment was returned, petitioner's attorneys filed a motion in the Superior Court of Polk County challenging the composition of the grand jury and the pool from which it had been drawn. Counsel asserted that the grand jury had been composed in violation of petitioner's sixth and fourteenth amendment right to a grand jury drawn from a fair cross-section of the community. Petitioner, who was twenty-five years old, contended that he had been denied this constitutional right because the grand jury did not contain the percentage of "young people" represented in the community. The next day, February 27, the court convened a hearing to consider petitioner's grand jury challenge. During the course of the hearing, at which the court postponed its consideration of the challenge to a later date,[8] petitioner's counsel informed the court that he would seek a psychiatric examination of petitioner "to fully protect his rights." Counsel did not elaborate further or indicate whether he would ask for an examination by a private psychiatrist or one conducted by a State psychiatrist.

On March 2, 1979, petitioner filed a motion for an independent psychiatric examination at the State's expense, "alleg[ing] on information and belie[f] that certain psychiatric problems will arise during the course of the preparation and defense of this case." In the motion, petitioner's

counsel suggested that Dr. William S. Davis, an Atlanta psychiatrist, examine petitioner because "[h]is advice, or the advice of some other psychiatrist chosen by the Defendant will be necessary in the preparation of the defense." Alleging financial hardship on behalf of petitioner, counsel requested that the State pay for the retention of Dr. Davis as a defense consultant "in order to insure said Defendant of a fair trial and due process of law under the Constitutions of the United States and Georgia."

Shortly thereafter, the State requested the court to have petitioner examined by the staff of the Forensic Services Division at Central State Hospital in Milledgeville, Georgia. On March 8, the court directed the staff at the Forensic Services Division to perform a complete psychiatric examination of petitioner, to assess his mental capacity at the time of the Tanner kidnapping and murder, and to determine his competence to stand trial.

Two days later, petitioner was admitted to the Forensic Services Division at the hospital. On April 20, 1979, Dr. Louis J. Jacobs, a "physician specialist," wrote to the court, informing it that the hospital's examination and evaluation had been completed. Dr. Jacobs stated that "[a] physical examination revealed a healthy individual. His electroencephalogram was normal, as was the skull series study. He required no medication except for mild muscle spasms in his back." Dr. Jacobs summarized the results of the psychiatric examination of petitioner as follows:

A psychiatric evaluation revealed no mental disorder. Day-to-day observa-

---

6. In Georgia, an accused being held in custody can demand, prior to indictment, a hearing (often referred to as a "committal hearing") for the purpose of determining whether probable cause exists to believe that the accused committed the crime charged and, if so, whether he should be detained while the grand jury considers his case. A grand jury indictment eliminates the accused's right to the hearing. *See* Ga.Code Ann. § 27–407 (Harrison 1978) (current version at Ga.Code Ann. § 17–7–23(a) (1982)); *First Nat'l Bank & Trust Co. v. State,* 137 Ga.App. 760, 224 S.E.2d 866, *aff'd,* 237 Ga. 112, 227 S.E.2d 20 (1976); *see also Fleming v. Kemp,* 748 F.2d 1435, 1439 n. 14 (11th Cir.1984).

7. Cedartown is the county seat of Polk County, and is where the grand jury convened.

8. The court postponed its consideration of petitioner's fair cross-section challenge to permit the parties to brief the question whether petitioner had waived his right to challenge the grand jury, and grand jury pool, by waiting to present his challenge until the grand jury had completed its deliberations and decided to indict petitioner, and also to give defense counsel time to obtain the statistical evidence necessary to prosecute the merits of the challenge.

tions of his behavior by the staff revealed no evidence of psychosis at any time during his stay here. He was found to be competent and responsible for his actions.

Based on our examination and evaluation, we have concluded that he is aware of the charge pending against him and the possible consequences. He is able to relate to his attorney in the preparation of his defense. Therefore, we consider him competent to stand trial at the present time.

As to his degree of criminal responsibility, it is our opinion that he is able to distinguish between right and wrong and was not acting under the influence of a compulsive delusion at the time of the alleged offense.

Petitioner was arraigned on May 8, 1979, and entered pleas of not guilty to both counts of the indictment. After receiving the pleas, the court turned to petitioner's grand jury challenge, and following an exchange with counsel postponed further consideration of the matter until May 22. The court advised the parties that it would hold a hearing on that date to consider petitioner's grand jury challenge and, also, the motion for a change of venue that petitioner's attorneys said they were preparing to file because of the intense publicity the case had generated.

Petitioner's counsel reminded the court that they had requested the appointment of an independent psychiatrist, and they asked for a ruling, arguing that "another [psychiatric] opinion would be helpful to the defendant and to the court." The court indicated a willingness to grant their request and to appoint Dr. Davis, the psychiatrist defense counsel preferred, if the State would agree. The court directed the prosecutor to confer with defense counsel and stated that if they could not agree on a psychiatrist, then it would determine whether to appoint Dr. Davis or someone else.

On May 22, 1979, the court and counsel assembled to hear petitioner's grand jury challenge, his motion for change of venue, and his motion for the appointment of a psychiatrist. The court, however, did not reach these matters. As the hearing was about to begin, petitioner's attorneys informed the court that petitioner and his family were making arrangements to retain a new attorney, John E. Sawhill, III, of nearby Rome, Georgia to represent petitioner, and were raising funds for that purpose. They described Sawhill, who was present, as having "substantial experience in defending serious criminal charges." The court acknowledged that Sawhill was "a highly competent attorney in civil and criminal matters" and proceeded to question Sawhill, petitioner, and petitioner's mother, Mary Messer, about the plan to substitute counsel. Their responses apparently satisfied the court that petitioner did wish to substitute Sawhill for the court-appointed attorneys and that Sawhill would accept the assignment. The court, however, wanted to give petitioner a few more days to think the matter over,[9] so it deferred its ruling on petitioner's request to substitute counsel for two weeks, until the next scheduled hearing in the case. At that hearing, which took place on June 5, the court asked petitioner and his mother whether they still wanted to replace the court-appointed attorneys with Sawhill. Petitioner responded that he wished to retain Sawhill as his lawyer. The court approved the substitution of counsel; Sawhill entered his appearance, and the court-appointed attorneys were discharged.

On June 14, Sawhill moved the court to appoint an independent psychiatrist, presenting the identical motion that petitioner's court-appointed attorneys had filed on March 2. Sawhill also moved the court, in a separate pleading, to provide "funds for expert witnesses." He alleged that such funds were necessary to ensure that petitioner would not be denied his sixth and fourteenth amendment rights to the effective assistance of counsel and due process of law. Among the experts Sawhill re-

---

**9.** Meanwhile, petitioner's grand jury challenge and his motions for change of venue and an independent psychiatric examination would be held in abeyance.

quested was a "psychologist and education testing specialist":

The Defendant has the need to employ a psychologist to perform intelligence and personality tests on the Defendant. The Defendant has already been given a preliminary evaluation at the Court's direction and it was determined that there was not reason to believe the Defendant was legally insane at the time of the alleged crime or unable to aid and assist in his defense. This evaluation was a short oral interview with a state doctor and did not involve any intelligence or personality tests. The Defendant's counsel, upon information and belief, have [sic] reason to believe that the Defendant suffers from a mental disease or defect that would affect his "capacity to appreciate wrongfulness of his conduct or conform his conduct to the requirements of law." A determination of this fact is relevant and material in (a) determining guilt, (b) determining his ability to aid in his defense, and (c) as a mitigating circumstance set forth in state law.[10]

Some time after Sawhill filed these motions, the court dismissed petitioner's indictment.[11] The record does not reveal the date of the dismissal or whether the court ever considered Sawhill's motions.

On November 5, 1979, the Polk County grand jury returned a superseding indictment, again charging petitioner, in two counts, with murder and kidnapping with bodily injury. On November 9, petitioner, represented by Sawhill, appeared for arraignment and pled not guilty to both counts of the indictment. After the pleas were entered, the court announced that

petitioner's trial would take place in January 1980, indicating that this would give defense counsel ample time to file motions and to prepare for trial.

On December 14, 1979, petitioner entered a special plea of insanity, questioning his competence to stand trial. *See* Ga.Code Ann. § 27–1502 (Harrison 1978) (current version at Ga.Code Ann. § 17–7–130 (1982)). This plea required the court to empanel a special jury to determine whether petitioner understood the nature and consequences of the criminal charges lodged against him, could assist his attorney in the preparation and presentation of his defense, and could withstand a trial. *Id.* On the same day, Sawhill filed a motion, identical to the one the court-appointed attorneys had filed on March 2 and he had renewed on June 14, for the appointment of an independent psychiatrist, preferably Dr. William S. Davis of Atlanta. As before, the motion "allege[d] on information and belief that cer[t]ain psychiatric problems will arise during the course of the preparation and defense of this case" and asserted that the assistance of an independent psychiatrist "will be necessary in the preparation of the defense."

The court held a pretrial hearing on petitioner's special plea of insanity on December 18. At that hearing, Sawhill, referring to his December 14 motion for the appointment of an independent psychiatrist, argued that the special plea of insanity obligated the court to consider appointing an independent psychiatrist to determine petitioner's competence to stand trial. After hearing from the prosecutor, the court indi-

---

10. Counsel inaccurately characterized the psychological evaluation conducted by the Forensic Services Division at Central State Hospital. During petitioner's six-week stay at the hospital, the Division gave him four tests measuring his psychomotor ability, achievement, reading level, and personality: the Bender Gestalt Test, Memory-for-Designs Test, Wide-Range Achievement Test, and the Minnesota Multiphasic Personality Inventory. The reports of these tests had been made available to defense counsel and to the prosecutor, but they had not been submitted to the trial court. The fact that Sawhill subsequently had access to these reports may explain why he did not renew his request for a psychologist and an education testing specialist to per-

form intelligence and personality tests on petitioner following his reindictment on November 5, 1979.

11. The dismissal order is not in the record; nor does the record contain any reference to its entry. Thus, we do not know whether the court dismissed the indictment on the basis of petitioner's grand jury challenge, whether the prosecutor moved the court to dismiss the indictment as a precautionary measure because he anticipated an adverse ruling on petitioner's challenge, or whether the court dismissed the indictment for some other reason.

cated a willingness to grant petitioner's motion if both sides could agree on a psychiatrist. The court advised counsel that if they could not agree within two days, by December 20, it would rule on the motion.

Apparently, the parties were unable to reach an agreement, and on December 20 the court denied petitioner's request for an independent psychiatric evaluation. On January 3, 1980, petitioner moved the court to reconsider its ruling, or, in the alternative, to order another examination of petitioner at Central State Hospital: "Counsel for the Defendant is unable to adequately and properly prepare for trial of the Special Plea of Insanity without at least a complete re-examination of this Defendant at the State facilities, so as to have a complete and current medical picture of the Defendant...."

The court heard argument on the motion on January 8. Sawhill, stating that the motion "speaks for itself," contended that a second examination was necessary to safeguard his client's rights because ten months had passed since petitioner's examination at Central State Hospital. The court denied petitioner's motion. It concluded that a second psychiatric examination was unnecessary for two reasons: first, petitioner had appeared before the court on several occasions and had never demonstrated any difficulty in communicating with the court or counsel; second, petitioner's counsel had presented nothing to indicate that his client was incapable of going to trial.

Nine days later, on January 17, the court reversed its ruling: "due to the severity of the charges in this case, and upon reflection, it is ordered that [petitioner] be returned to the state facility at Milledgeville for a further examination to determine his capability to assist [counsel] and stand trial on the charges against him." Shortly

thereafter, petitioner was admitted to the Forensic Services Division at Central State Hospital.

On January 23, Dr. Jacobs once again reported to the court for the Division. The Division concluded, he said, that petitioner had "No Mental Disorder," finding that "[h]is ideation remains intact. We detected no looseness of associations or wanderings of his ideas and he had no bizarre ideas. He was well oriented in all spheres and his memory was excellent. Intellectual function was that of a normal level.... No medication was felt to be necessary during his stay here." The Division also concluded that petitioner was capable of cooperating with his attorney in formulating a defense and of standing trial.

On January 28, petitioner withdrew his special plea of insanity. That same day, the State notified petitioner that it would seek the death penalty.[12]

The case went to trial on February 4, 1980. The State's case in chief firmly, if not overwhelmingly, established that petitioner perpetrated the Tanner kidnapping and murder and, moreover, that he did so of his own free will. Particularly damaging to the defense on both points was the testimony of the FBI agent, Robert C. Leary, Jr., who, together with Agent Vernon Kennon of the Georgia Bureau of Investigation and Officer John Dean of the Cedartown Police Department, had interviewed petitioner and obtained his confession at the Cedartown police station after the victim's body was found. Agent Leary testified that before the interview commenced, Agent Kennon told petitioner that he was not under arrest and that he was free to leave at any time. Kennon also advised petitioner of his *Miranda* rights, including the right to have an attorney present during the interview.

---

12. In its notice the State identified two statutory aggravating circumstances upon which it intended to rely: (1) the offense of murder was committed while petitioner was engaged in the capital offense of kidnapping with bodily injury, *see* Ga.Code Ann. § 27–2534.1(b)(2) (Harrison 1978) (current version at Ga.Code Ann. § 17–10–30(b)(2) (1982)); and (2) the offenses of murder and kidnapping with bodily injury were "outrageously or wantonly vile, horrible, or inhuman in that [they] involved torture, depravity of mind, or an aggravated battery to the victim." Ga.Code Ann. § 27–2534.1(b)(7) (Harrison 1978) (current version at Ga.Code Ann. § 17–10–30(b)(7) (1982)).

Leary said that he began the interview by informing petitioner that he was one of several people who would be questioned and by asking him if he would account for his whereabouts the day before, when Rhonda Tanner disappeared. Petitioner complied and in the process denied killing Rhonda. At this point, Agent Leary confronted petitioner with the fact that several witnesses had seen him, on the day Rhonda disappeared, in places he could not have been were his version of his day's activities true. When told that the principal of Rhonda's school had just picked his photograph out of a line-up, petitioner responded by saying "[H]ow much time will I get[?]" Leary replied that his job was simply to ask questions and not to determine punishment. When asked why he had killed Rhonda, petitioner, according to Leary, "said 'I don't know why I did it,' and at that point he started crying, sobbing, he put his face in his hands and kept his face in his hands for the next fifteen minutes during the next part of the interview." After petitioner started crying, Agent Leary asked petitioner if he thought he needed psychiatric help:

I asked him ... he had his face in his hands and he was saying that he would never see his wife again and he was crying and he was saying "I know I'm not crazy" and I ask[ed] him did he think maybe he was sick and needed psychiatric help and he repeated, he said "I know I'm not crazy", and I said "well, I'm not saying you're crazy I'm just saying do you think maybe you might need some help, some psychiatric help", and he said "maybe I do need help", and then I went through with him in detail his movements of the previous day to find out exactly where he had been.

After three days of testimony, the State rested its case. The court then declared a brief recess. At the conclusion of the recess, the defense rested, without putting on any evidence. This tactic gave the defense the right, under Georgia practice, to make the opening and closing arguments to the jury. Petitioner's attorney waived his opening argument, preferring to save his comments for rebuttal, after he heard what the prosecutor had to say.

In his remarks to the jury, the prosecutor, mindful that the trial judge would be instructing the jury that it could not convict the defendant if it found that he was suffering from a mental disease that prevented him from knowing right from wrong [13] at the time the offenses were com-

13. The court's charge to the jury included an instruction on the issue of insanity. Petitioner did not request the court to give this instruction; the court appears to have given it *sua sponte.* Petitioner requested, on the day the court submitted the case to the jury, a total of 14 instructions, three of which touched on petitioner's mental condition. We quote below the court's entire charge on insanity, italicizing the portion that petitioner requested:

Our law declares that a person shall not be convicted of any crime committed while insane. The test is that if a person has reason sufficient to distinguish between right and wrong in relation to a particular act about to be committed he or she is criminally responsible. The standard by which his or her acts are to be judged is that of the conduct of a reasonable person. To be punishable by law a person must have sufficient memory, intelligence, reason, and will to enable him or her to distinguish between right and wrong in regard to the particular act about to be done, to know and understand that it will be wrong and that he or she will deserve punishment by committing it. Though an accused may not be able to evaluate the quality and consequences of his act to the same degree as a

normal or average individual still that would be no defense nor excuse him if he is able to distinguish between right and wrong. Mental abnormality or mere weakness of mind is no excuse unless it amounts to imbecility or idiocy which deprives the offender of the ability to distinguish between right and wrong as to the particular offense involved.

*I charge you that mental disease differs in its susceptibility to detection by sheer observation in the normal course of human relationships especially by laymen who may not have an extended opportunity to observe the person in question. I charge you that normal conduct and abnormal conduct are matters of common knowledge so lay persons may conclude from observation that certain observed conduct is abnormal.*

As I have charged you earlier *criminal intent being an essential element of every crime it is a question of fact to be determined by you whether such criminal intent was present in the mind of the defendant at the time of the alleged crime, that is to say whether the defendant was mentally capable of such criminal intent and whether the defendant acted with such intent at the time of the alleged act or*

mitted, took steps to dispel any doubt the jury might have had as to petitioner's sanity at that time. The prosecutor pointed to the testimony of numerous witnesses who had described petitioner as functioning normally both before and after the kidnapping and murder and argued that despite the somewhat bizarre manner in which petitioner assaulted and killed Rhonda Tanner, he was not insane when he committed the crimes charged.

Petitioner's attorney, in his closing argument, did not dispute the prosecutor's assessment of the evidence in the case. "I would be no less honest with each and every one of you," he told the jury, "if I tried to tell you the evidence said something other than what [the prosecutor] indicates occurred on that day so I'm not going to." He simply asked the jurors, in reaching their verdicts, to put aside any prejudice they might have against his client, to disregard anything they may have heard beyond the courtroom, and to decide the case solely on the evidence. Counsel made no effort to convince the jurors that they should find his client not guilty on the ground of insanity. Rather, he simply implored them to use their common sense in reaching their decisions.

The jury found petitioner guilty as charged, on both counts of the indictment. Shortly after the jury returned its verdicts, the sentencing phase of the proceedings began. The prosecution presented no additional evidence, choosing to rely on the evidence adduced during the guilt phase to support its demand for the death penalty. The defense called a sole witness, petitioner's mother, who, during her testimony, did not touch upon the state of her son's mental or emotional health. In fact, neither the prosecutor nor defense counsel, in addressing the jury on the sentences it should impose, suggested that petitioner's mental or emotional condition might be a factor the jury should take into account in reaching their decision.

The jury found that the kidnapping and murder had been committed under aggravating circumstances, and it fixed petitioner's punishment at death, on both counts. The next day, February 8, 1979, the trial judge, being bound by the jury's decision, sentenced petitioner accordingly.

On direct appeal to the Supreme Court of Georgia, petitioner raised six claims of error. The first claim was the one we address today: that the trial court denied him due process of law [14] when it refused to grant his motion for an independent psychiatric examination.[15] The supreme court

*was mentally capable of distinguishing between right and wrong with reference to that act.* The act itself may be so utterly senseless and abnormal as to furnish satisfactory proof of a diseased mind. In determining the issue of sanity or insanity the jury may consider the acts and mental condition of the accused as revealed by the evidence before and after the commission of the alleged offense, if any, and the declarations, if any, of the defendant made at the time of the alleged offense or reasonably close thereto as proof of his mental condition at the time of such alleged offense.

If you find that the defendant did not have reason sufficient to distinguish between right and wrong, as I have instructed you, at the time of the commission of such alleged offense that would be an end to your consideration of the case and you would stop at that point and enter a verdict that would reflect that finding. The form of that would be "we the jury find the defendant not guilty by reason of insanity". Should this be your verdict the law of this state provides that it shall become the duty of the trial judge to retain jurisdiction of the person and to order that

person to be confined in a state hospital for the mentally ill. If, however, from a consideration of the evidence you determine that at the time and place of the occasion under investigation in this trial that the defendant was sane and thus responsible, in such event you would proceed to consider the other portions of the charge that I have given you or will give you.

**14.** In his brief on direct appeal, petitioner alleged that the trial court also denied him the equal protection of the laws when it refused to provide him psychiatric assistance. The analysis of petitioner's due process and equal protection claims is the same. *See Moore v. Kemp,* 809 F.2d 702, 709 n. 6 (11th Cir.) (en banc), *cert. denied,* — U.S. ——, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).

**15.** In his brief, petitioner pointed to nothing in the trial record, beyond his naked requests for psychiatric assistance, to show that he needed expert assistance to establish an insanity defense or mitigating evidence. We assume that the same can be said of his subsequent petition

found no merit in petitioner's claims of error and, on March 3, 1981, affirmed his convictions and sentences. The court found no merit in petitioner's first claim because petitioner's attorney failed to present the trial judge with an adequate factual basis for an independent psychiatric examination at State expense. *See Messer v. State,* 247 Ga. 316, 276 S.E.2d 15 (1981). On March 18, 1981, the supreme court denied petitioner's motion for rehearing. Petitioner thereafter sought a writ of certiorari in the Supreme Court of the United States, challenging, among other things, the Georgia Supreme Court's disposition of his argument concerning the refusal of the trial judge to order an independent psychiatric examination. His petition was denied. *Messer v. Georgia,* 454 U.S. 882, 102 S.Ct. 367, 70 L.Ed.2d 193 (1981).

## C.

On January 5, 1982, petitioner applied to the Superior Court of Butts County, Georgia for habeas corpus relief. Petitioner sought relief on several grounds, one of which is relevant to our inquiry in this case: petitioner claimed that his attorney, Sawhill, had provided him ineffective assistance, in violation of the sixth and fourteenth amendments. Petitioner alleged that Sawhill, in seeking the appointment of an independent psychiatrist, should have, but did not, demonstrate why he needed a psychiatrist.[16] Consequently, the court did not appoint one. Specifically, petitioner alleged as follows:

> Counsel totally failed to investigate, pursue or present all available tenable defenses on behalf of [petitioner]. Particularly, counsel failed to pursue the insanity defense. Petitioner, a twenty five year old male, with not so much as a traffic ticket all of a sudden is involved in a serious felony. Yet counsel totally failed to raise the defense and present any witnesses on Petitioner's sanity. Furthermore, counsel failed to cross-examine any of the State's witnesses who

had contact with Petitioner on the issue of insanity. At least eight State witnesses alluded that Petitioner may have had emotional problems on the day of the incident: Retha Wood, Sam Brabson, Jane Hackney, Pricilla Fay, Robin Sides, Pamela Dunn, FBI Agents Guest and Leary. Counsel totally failed to cross examine these witnesses at all despite testimony which would clearly require counsel to explore and present the insanity issue.

> Counsel neglected to seek any psychiatric evaluation concerning Petitioner's state of mind at the time of the crime and offered no evidence at all in defense. Rather counsel only sought an evaluation of Petitioner as to his competency to stand trial.

He also alleged that

> [c]ounsel failed to pursue and present in an effective manner the Special Plea of Insanity. Initially, pursuing this plea and filing a Motion for Private Psychiatric Examination at Government expense, counsel first, failed to present any evidence so as to indicate why such an examination should be ordered. (See *Hearing,* December 18, 1979). And, second, counsel, for unknown reasons, subsequently withdrew the Special Plea (See Record Vol. p. 34).

The superior court dismissed this claim, and the others contained in the petition, on the merits on February 23, 1982. The Supreme Court of Georgia declined review, denying petitioner's application for a certificate of probable cause to appeal on April 20, 1982. Petitioner thereafter sought certiorari review in the Supreme Court of the United States on grounds unrelated to his ineffective assistance claim. The Court denied his petition. *Messer v. Zant,* 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982).

On November 23, 1982, petitioner applied to the United States District Court for the Northern District of Georgia for a writ of habeas corpus. He presented fifteen

---

for a writ of certiorari filed in the Supreme Court of the United States.

**16.** Petitioner also alleged that counsel provided ineffective assistance in several other respects, none of which is relevant to this appeal.

claims for relief. Among them was the ineffective assistance of counsel claim he had asserted in his state habeas petition. Petitioner alleged that his trial lawyer had rendered ineffective assistance because he "ignored the insanity defense" and "neglected to seek any psychiatric evaluation concerning Petitioner's state of mind at the time of the crime and offered no evidence at all in defense. Rather counsel only sought an evaluation of Petitioner as to his competency to stand trial." As an alternative claim, petitioner alleged that his attorney did not ignore the insanity defense and the need for a psychiatric evaluation to establish that defense; indeed, his attorney moved the court "for an independent psychiatric examination and for funds to hire a psychiatrist or psychologist to serve as an expert witness." The court should have granted his motion, and in refusing to do so, petitioner alleged, it deprived him of rights guaranteed by the sixth, eighth, and fourteenth amendments.

The district court referred the matter to a magistrate, who conducted an evidentiary hearing and in his report to the court recommended that the writ not issue as to petitioner's convictions.[17] On March 30, 1984, the district court, adopting in part the magistrate's report and recommendation, denied relief. With respect to petitioner's claim that his attorney rendered ineffective assistance by failing to pursue an insanity defense, the court adopted the magistrate's conclusion that counsel had not been ineffective, because he "attempted to ascertain whether there were any facts available which he could utilize to raise an insanity defense." With respect to petitioner's claim that the trial judge erred in not appointing or providing funds for an independent psychiatrist, the court found no error, "[b]ecause petitioner was examined twice at Central State Hospital and petitioner has not presented any evidence to raise any doubts as to the reliability of these examinations."

Petitioner appealed, presenting only three of the fifteen claims he had presented to the district court. None of the three is pertinent here. Specifically, petitioner did not ask this court to review his claim that the trial judge erred in not appointing an independent psychiatrist to examine petitioner and to assist his attorney in the preparation and conduct of his defense. Nor did petitioner seek review of his alternative claim, that the trial court's failure to appoint an independent psychiatrist was caused by his attorney's negligence in failing adequately to demonstrate the need for a psychiatrist. A panel of this court found no error in the district court's judgment and affirmed. *See Messer v. Kemp,* 760 F.2d 1080 (11th Cir.1985). The Supreme Court thereafter denied petitioner's application for a writ of certiorari. *Messer v. Kemp,* 474 U.S. 1088, 106 S.Ct. 864, 88 L.Ed.2d 902 (1986).

On June 26, 1986, petitioner returned to state court for habeas corpus relief. His petition set forth five claims, including the one now before us. That claim, of course, is that the state trial judge denied petitioner his due process right to a fair trial when it refused to provide, at State expense, for an independent psychiatrist to examine petitioner and to assist his attorney in the preparation and presentation of his defense. Petitioner asserted that he was entitled to this psychiatric assistance because his attorney satisfactorily demonstrated to the trial judge that his sanity at the time of the offense was likely to be a significant factor at trial. According to petitioner, the facts before the trial court "clearly indicat[ed] that sanity would be not only a significant factor at trial but the sole issue in the case." Citing the Supreme Court's recent decision in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), decided subsequent to the termination of his first state habeas proceeding,

---

**17.** The magistrate recommended that the writ be granted as to petitioner's death sentences on the ground that his trial attorney provided him ineffective assistance of counsel at his sentencing proceeding because his argument to the jury was inadequate. The district court, however, rejected this recommendation because it found that the trial attorney's performance had not prejudiced petitioner. With regard to petitioner's challenge to his convictions, the court adopted the magistrate's recommendation that the writ not issue.

petitioner contended that he was entitled to a new trial as a matter of law.

After hearing argument of counsel, the court granted the State's motion to dismiss the petition as successive as to all claims except the one based on *Ake*. With respect to that claim, the court reviewed the record of the pretrial and trial proceedings in petitioner's criminal prosecution and reached this conclusion:

> Applying the standard set forth in *Ake*, petitioner has not shown this Court that he made the necessary demonstration to the trial judge that his sanity at the time of the offense was to be a significant factor at his trial.... Therefore, petitioner's claim based on *Ake v. Oklahoma* ... is found to be without merit.

(Citations omitted.) On June 30, 1986, the Supreme Court of Georgia denied petitioner's application for a certificate of probable cause to appeal.

### D.

On July 1, 1986, petitioner filed a second petition for a writ of habeas corpus in the district court. He sought relief on the ground that he, as an indigent defendant, "was denied funds to hire an independent psychiatrist to aid in his defense, in violation of his rights under the Georgia Constitution and under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution." [18] He contended that the trial court's denial of independent psychiatric assistance prevented him from (1) presenting at the guilt phase of his trial any medical evidence as to his mental state at the time of the offenses, and (2) introducing during the sentencing phase of the trial mitigating evidence that might have explained his behavior and prompted the jury to spare his life. Petitioner asserted that he was entitled to this psychiatric assistance because he made the preliminary showing to the trial court, as required by *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), that his sanity would be a significant factor at both the guilt and sentencing phases of his trial.

After hearing argument of counsel, the district court concluded that petitioner's claim, which we refer to as the *Ake* claim, "constitutes a successive petition that has been decided on the merits in the previous [federal] habeas corpus proceeding" and that "the 'ends of justice' would not be served by reaching the merits of the successive petition." Accordingly, on July 7, 1986, the district court refused to issue the writ. The next day, a panel of this court denied petitioner's application for a certificate of probable cause for the reasons given by the district court, adding the following:

> We expand upon the conclusions therein to the extent that were we to consider the *Ake* claim on its merits we would find that petitioner has failed to make out a "colorable claim" based upon the record presented. Multiple requests for funds for a private psychiatric examination, standing alone, are insufficient.

*Messer v. Kemp*, 794 F.2d 573, 573 (11th Cir.1986). Petitioner immediately applied to the Supreme Court for a stay of his execution, pending the filing of a petition for a writ of certiorari, and the Court granted the stay the following day, July 9. On July 28, petitioner filed in this court a suggestion for rehearing en banc, which we denied on September 5, 1986. *Messer v. Kemp*, 801 F.2d 404 (11th Cir.1986). On January 5, 1987, acting *sua sponte*, we vacated our order denying rehearing en banc, and decided to rehear petitioner's application for a certificate of probable cause and his motion for a stay of execution. *See Messer v. Kemp*, 808 F.2d 757 (11th Cir. 1987).

---

**18.** In addition to his *Ake* claim, petitioner claimed in his second federal habeas petition that the death penalty in Georgia was imposed in violation of the eighth amendment because it was applied in a racially discriminatory manner. In light of this court's decision in *McCleskey v. Kemp*, 753 F.2d 877 (11th Cir.1985) (en banc), the district court found petitioner's second claim to be meritless. After the district court's order, the Supreme Court affirmed this court's decision in *McCleskey*. *See McCleskey v. Kemp*, —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Given the Court's holding in that case, we conclude that the district court's ruling on petitioner's *McCleskey* claim was correct.

## II.

■ The threshold question we must decide is whether we have jurisdiction to consider petitioner's application for a certificate of probable cause. If we conclude that we do have jurisdiction and grant the certificate, we then must decide whether we should entertain the merits of petitioner's appeal, given that the Supreme Court has issued a stay of his execution pending the application for and disposition of a petition for writ of certiorari. We hold that the Supreme Court's stay did not divest this court of jurisdiction to consider petitioner's appeal en banc.

The Supreme Court and the other federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. § 1651(a) (1982). This statute authorizes the Court to issue a stay to preserve issues for judicial review. *See Republican State Cent. Comm. v. Ripon Soc'y Inc.,* 409 U.S. 1222, 1225–27, 93 S.Ct. 1475, 1477–78, 34 L.Ed.2d 717 (Rehnquist, Circuit Justice 1972). For example, "[p]erhaps the most compelling justification for a Circuit Justice to upset an interim decision by a court of appeals would be to protect this Court's power to entertain a petition for certiorari before or after the final judgment of the Court of Appeals." *New York v. Kleppe,* 429 U.S. 1307, 1310, 97 S.Ct. 4, 6, 50 L.Ed.2d 38 (Marshall, Circuit Justice 1976) (citation omitted); *see Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) (Supreme Court stayed execution of petitioner after court of appeals denied stay and, treating application for stay as petition for certiorari, granted certiorari before judgment in court of appeals). Although a decision by the Court to grant a stay may take into account "[w]hether the applicant has a reasonable probability of prevailing on the merits of the case," R. Stern, E. Gressman & S. Shapiro, *Supreme Court Practice* § 17.19 (6th ed. 1986) (citing *Rostker v. Goldberg,* 448 U.S. 1306, 1308, 101 S.Ct. 1, 2, 65 L.Ed.2d 1098 (Brennan, Circuit Justice 1980)), it is not a merits decision. We therefore conclude that the Supreme Court's stay of the execution in this case does not prevent, or counsel against, our consideration en banc of petitioner's application for a certificate of probable cause. *See* R. Stern, E. Gressman & S. Shapiro, *supra,* § 17.13.

In its brief, the State argues that as a matter of policy, we should decline to consider petitioner's application for a certificate of probable cause and to reach the merits of petitioner's case because he, "after having been denied a stay by a panel of this Court, rather than seeking a stay from the *en banc* court, went straight to the Supreme Court ... representing that the stay was for purposes of filing an application for a writ of certiorari." The State suggests that petitioner took this course because he had been dilatory in pursuing his appeals. We reject the State's policy argument. If it has any merit, it is certainly overridden by the contravening policy of offering the Supreme Court whatever benefit this court can give it by rehearing a case en banc before the Court decides whether to grant a petition for writ of certiorari. Accordingly, we exercise our jurisdiction over petitioner's application for a certificate of probable cause.

## III.

■ When we scheduled oral argument on petitioner's application for a certificate of probable cause, we instructed the parties to brief the merits of petitioner's *Ake* claim so that if we granted the certificate, we could pass on the merits without further briefing. *See Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3395, 77 L.Ed.2d 1090 (1983) ("When a certificate of probable cause is issued ... petitioner must then be afforded an opportunity to address the merits, and the court of appeals is obligated to decide the merits of the appeal."). The standard for granting a certificate of probable cause is that the petitioner must "make a 'substantial showing of the denial of [a] federal right.'" *Id.* at 893, 103 S.Ct. at 3394 (citations omitted). In this case, the federal right is the right to relitigate a claim in a successive habeas petition when the ends of justice so require. Petitioner contends, in his application for a certificate

of probable cause, that the district court should have permitted him to relitigate the propriety of the trial judge's refusal to grant him psychiatric assistance because such refusal, when tested under the standard the Supreme Court established in its intervening *Ake* decision, may have operated to deny him a fair trial. On reflection, we are satisfied that petitioner has met the probable cause standard and accordingly address the merits of his appeal.

As noted, the district court refused to consider the merits of petitioner's *Ake* claim because "the 'ends of justice' would not be served by reaching the merits of the successive petition." The court therefore denied petitioner habeas relief. We agree that the district court correctly denied relief. We find that the ends of justice did not require the court to relitigate the claim because the record fails to disclose a constitutional violation.

### A.

Under Rule 9(b) of the Rules Governing Section 2254 Cases, *see* 28 U.S.C. § 2254 (1982), "[a] second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits...." Although a federal court may have previously rejected a petitioner's claim on the merits, a habeas judge will entertain it if the petitioner establishes that the "ends of justice" would be served by relitigation of the claim. *See Sanders v. United States*, 373 U.S. 1, 16, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963). As the Supreme Court observed in *Sanders*, the "ends of justice" standard "cannot be too finely particularized" and encompasses such factors as an intervening change in the law.[19] *Id.* at 16–17, 83 S.Ct. at 1078.

In applying the "ends of justice" standard in this case, we note the nature of the *Ake* issue presently before the court. As we observe *infra*, *Ake* focuses on the information available to the trial judge when he denied the defendant's motion for the provision of an independent psychiatrist. Thus, our review of this question, like that of the district court, focuses on the cold record of petitioner's criminal proceedings; a resolution of the merits of this case does not require an evidentiary hearing, because no live testimony would be relevant to the scrutiny of petitioner's criminal proceedings. Moreover, the *Ake* issue in this case is a pure question of law; the parties do not dispute what information was before the trial judge, but rather the legal significance, under *Ake*, of that information.

Because we conclude, as a matter of law, that the record in this case fails to disclose an *Ake* violation, our "ends of justice" analysis need not proceed any further.[20]

**19.** The Supreme Court recently examined and refined the "ends of justice" standard. *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). In *Kuhlmann*, a four-justice plurality of the Court contended that the "ends of justice" mandate consideration of successive petitions only when the petitioner "supplements his constitutional claim with a colorable showing of factual innocence." *Id.* at ——, 106 S.Ct. at 2627 (plurality). Three other justices expressed the view that a colorable claim of factual innocence is not essential to establish that the "ends of justice" warrant consideration of a petitioner's previously decided claim. *Id.* at ——, 106 S.Ct. at 2634–35 (Brennan, J., joined by Marshall, J., dissenting); *id.* at ——, 106 S.Ct. at 2639 (Stevens, J., dissenting). The two remaining justices, Justices Blackmun and White, concurred in the Court's alternative holding, *id.* at ——, 106 S.Ct. at 2628–31 (rejecting petitioner's successive claim on the merits), and expressed no view on the need for a colorable claim of factual innocence in a successive habeas petition. Thus, *Kuhlmann* leaves open the proper standard governing successive petitions. In this case, we need not decide whether a colorable claim of factual innocence is an essential prerequisite to such a petition, because we find petitioner's claim to be without merit.

**20.** Our approach to the "ends of justice" analysis in this case is analogous to the manner in which a court might approach the four-pronged test for granting preliminary injunctions. *See Cunningham v. Adams*, 808 F.2d 815, 818–19 (11th Cir.1987) (preliminary injunction should be granted only if moving party (1) clearly establishes a substantial likelihood that he will ultimately prevail on the merits; (2) shows that he will suffer irreparable injury unless the injunction issues; (3) proves that the threatened injury to him outweighs whatever damage the proposed injunction may cause the opposing party; and (4) shows that the injunction, if issued, would not be adverse to the public interest). If, as a matter of law, a party seeking a preliminary injunction cannot prevail on the merits, a

That is, we need not address any other factors relevant to the "ends of justice" in light of our conclusion that no constitutional violation occurred.

## B.

In *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 1097, 84 L.Ed.2d 53 (1985), the Supreme Court concluded that the due process clause's guarantee of fundamental fairness is implicated "when [an indigent] defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial," and that "the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Our court, sitting en banc, recently had the opportunity to reflect upon the facts of *Ake* and the Supreme Court's analysis of those facts, *see Moore v. Kemp*, 809 F.2d 702, 710–11 (11th Cir.) (en banc), *cert. denied,* —— U.S. ——, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987):

Ake was arrested and charged with murdering a couple and wounding their two children. At his arraignment, and while in jail, his behavior was so bizarre that the trial judge, *sua sponte*, ordered him examined by a psychiatrist. As a result of that examination, Ake was committed to a state hospital for a determination of his competency to stand trial. A few weeks later, the chief forensic psychiatrist at the state hospital told the court that Ake was not competent to stand trial. After a competency hearing, the court found Ake to be a "mentally ill person in need of care and treatment," *id.* [470 U.S.] at 71, 105 S.Ct. at 1091, and incompetent to stand trial. The court ordered him committed to the state mental hospital. Six weeks later, the chief forensic psychiatrist advised the court that Ake, who was being treated with an antipsychotic drug, had become competent to stand trial. The court thereafter found Ake to be competent,

and the criminal prosecution resumed. *See id.* at 70–72, 105 S.Ct. at 1090–91.

At a pretrial conference, defense counsel informed the court that his client would raise an insanity defense at trial. The attorney further stated that in order to prepare and present that defense a psychiatrist would have to examine Ake with respect to his mental condition at the time of the murders. Because during his stay at the state hospital Ake was not examined to determine his sanity at the time of the offenses and, as an indigent, could not afford to pay a psychiatrist, counsel asked the court either to arrange or provide the necessary funds for such an examination. The court denied counsel's motion. *See id.* at 72, 105 S.Ct. at 1091.

At trial, defense counsel did not dispute Ake's involvement in the charged crimes; his sole argument was that Ake was not guilty by reason of insanity. To support his argument, counsel called the psychiatrists who had examined Ake at the state hospital and questioned them about his mental condition at the time of the offenses. They were unable to render an opinion on the point, however, because they had not examined Ake for that purpose. As a result, no one testified as to his sanity at the time of the offenses, and, having failed to carry his burden of proof on the insanity defense, he received guilty verdicts. The State then sought the death penalty. Following a sentencing hearing, in which the parties presented no additional expert testimony, the jury recommended that Ake be sentenced to death for each of the two murders, and he was sentenced accordingly.

Ake appealed to the Oklahoma Court of Criminal Appeals, claiming, among other things, that his convictions and death sentences were invalid because the trial court's failure to provide psychiatric assistance denied him a fair trial. The court of criminal appeals rejected that claim on a procedural ground, holding

---

district court obviously need not reach the remaining prongs of the analysis. It would simply deny injunctive relief and, in effect, decide the question of law on the merits.

that he had waived it by not challenging the trial court's ruling in his motion for a new trial. The Supreme Court of the United States, on certiorari, reversed Ake's conviction and remanded the case for a new trial because the failure to provide psychiatric assistance operated to deny Ake due process of law.

In reaching this conclusion, the Supreme Court focused on the information available to the trial judge when defense counsel requested psychiatric assistance and on the effect the denial of such assistance had on the presentation of Ake's defense at trial. The Court observed that when Ake's counsel requested the provision of a psychiatrist, the trial judge knew that insanity would be Ake's sole defense, that his case rested on his ability to prove that he was insane when he committed the crimes, and that none of the state psychiatrists who had examined and treated Ake had undertaken to assess his mental condition at that time. In addition, the trial judge had determined previously that Ake was suffering from a mental illness that may have affected him at the time of the shootings and had rendered him incompetent to stand trial for a six-week period. Finally, the trial judge knew that Ake could stand trial only if he remained under medication. The Supreme Court concluded that, given the facts before the trial judge and defense counsel's explanation for requesting expert assistance, it was unreasonable for the trial judge to have denied the request; he should have known that to refuse the request would be to deny the defendant an adequate opportunity to prepare and present his insanity defense. The Court further concluded, on the basis of what took place at trial, that the denial of expert assistance precluded Ake from presenting an effective defense.

We have interpreted *Ake* and another Supreme Court case, *Caldwell v. Mississippi,* 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985) (plurality) (because "petitioner offered little more than undeveloped assertions that the requested assistance [of a criminal investigator, a fingerprint expert, and a ballistics expert] would be beneficial, [there was] no deprivation of due process") (citation omitted), to hold the following:

> [A] defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather, a fair reading of these precedents is that a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.

*Moore v. Kemp,* 809 F.2d 702, 712 (11th Cir.) (en banc), *cert. denied,* —— U.S. ——, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987) (footnotes omitted). Specifically, we have held that if a defendant desires the appointment of an expert so that he can present an affirmative defense, such as the defense of insanity, "he must demonstrate a substantial basis for the defense, as the defendant did in *Ake.*" *Id.* [21]

We now address the merits of petitioner's *Ake* claim. We begin, as the Supreme Court did in *Ake,* by examining the information before the trial judge when he denied the defendant's motion for the appointment of an independent psychiatrist. *See id.* at 713. We then decide whether that information should have led the trial judge to conclude that without the assistance of a psychiatrist the defendant would probably not receive a fair trial.

**21.** We stated that "the defendant's showing must also include a specific description of the expert or experts desired" and that "the defendant should inform the court why the particular expert [e.g., a psychiatrist or psychologist in an insanity defense case] is necessary." *See Moore,*

809 F.2d at 712. Defense counsel, we noted, "is obligated to inform himself about the specific scientific area in question and to provide the court with as much information as possible concerning the usefulness of the requested expert [e.g., psychiatrist] to the defense's case." *Id.*

## C.

The trial judge received information concerning petitioner's mental condition from five sources during the course of petitioner's criminal prosecution: (1) the representations petitioner's attorneys made in their formal motions for psychiatric assistance; (2) the statements counsel made in open court regarding the need for such assistance; (3) Dr. Jacobs' reports of the results of petitioner's two psychiatric examinations at Central State Hospital; (4) the court's own observations of petitioner at several hearings prior to trial and at the trial itself; and (5) the evidence adduced at trial. Placing ourselves in the shoes of the trial judge, we analyze the information he received as it was brought before him.

The court's first indication that petitioner's mental condition might play a significant role in the case came on February 27, 1979, the day after petitioner's original indictment. The court had convened a hearing to consider petitioner's grand jury challenge, and during the hearing one of petitioner's court-appointed attorneys informed the court that he would be seeking a psychiatric examination of petitioner "to fully protect [petitioner's] rights." Counsel made no further explanation; notably, he did not indicate whether he had reason to believe that petitioner may have been insane at the time of the Tanner murder or was incompetent to stand trial. The motion petitioner's attorneys filed three days later, on March 2, was just as vague. Their motion sought an independent psychiatric examination of petitioner, as opposed to one conducted by a State psychiatrist. Counsel based their request on "information and belie[f]"; counsel believed "that certain psychiatric problems will arise during the course of the preparation and defense of this case." Counsel did not, however, describe the psychiatric problems they anticipated; nor did they suggest what a psychiatrist might be able to do about the problems.

Before the court could rule on defense counsel's request, the prosecutor suggested that the court have petitioner examined to determine his competence to stand trial.

The court followed the prosecutor's suggestion, and on March 8 ordered the Forensic Services Division at Central State Hospital to examine petitioner. The court directed the Division to ascertain petitioner's competence to stand trial and, also, his sanity at the time of the offense. The Division subsequently found petitioner to be aware of the nature and consequences of the charges pending against him and capable of assisting his attorney in the preparation of his defense; it also concluded that he was sane at the time of the offenses. At this point, the court had no reason to believe that petitioner's mental condition would be a significant factor at trial. Indeed, based on the evidence before it, the court had every reason to believe that petitioner's mental condition would not be an issue at trial.

Petitioner's counsel offered nothing to counter this situation at their next appearance before the court, on May 8, for petitioner's arraignment. Counsel did remind the court that their motion for the appointment of a psychiatrist was still pending, and that "another [psychiatric] opinion would be helpful to the defendant and to the court." They did not, however, point to anything in petitioner's pattern of behavior that suggested that petitioner might be incompetent to stand trial or that his mental condition would be an issue at trial. Nor did they give any indication that petitioner needed psychiatric help. Nonetheless, the court stated that it would be willing to appoint an independent psychiatrist, Dr. Davis for example, if both sides could agree. If not, the court would settle the matter at the next hearing, on May 22.

The record does not reveal what transpired between the parties on this issue between May 8 and May 22. What is clear, however, is that petitioner's attorneys did not pursue their request for the appointment of a psychiatrist when they returned to court on May 22. The only matter that came before the court that day was whether the court should permit petitioner to replace his court-appointed attorneys with Sawhill. The court examined petitioner about his plan to hire Sawhill, and in re-

sponding, petitioner gave no indication that he was experiencing any mental or emotional difficulty. In fact, he appeared to be lucid and plainly aware of what was taking place.

On June 5, the court again examined petitioner about his desire to replace his court-appointed attorneys with Sawhill, and once again, petitioner behaved normally. His responses to the court's questions satisfied the court that he was fully competent to request the discharge of his court-appointed attorneys and to hire his own lawyer. Accordingly, the court approved his request. On June 5, petitioner's motion for the appointment of an independent psychiatrist had been pending for over three months, but no one brought it to the court's attention at the hearing that day.

On June 14, Sawhill renewed petitioner's request for the appointment of an independent psychiatrist, filing the same motion his predecessors had filed on March 2. As noted earlier, that motion, which, like its predecessor, was based on "information and belief," contained no indication that petitioner's mental condition might be a significant factor at trial. Sawhill did file a supplemental motion, however, in which he represented, again "on information and belief," that he had reason to believe that petitioner was insane when the crime occurred and that this fact would be "relevant and material in (a) determining guilt, (b) determining [petitioner's] ability to aid in his defense, and (c) as a mitigating circumstance," presumably in determining petitioner's sentence.[22] Counsel, however, did not articulate the factual basis for his belief. Hence, the factual information before the court on June 14 was the same as it had been on June 5: the doctors at Central State Hospital had given petitioner a clean bill of health, and petitioner seemed to be in control of himself.

There is no indication in the record that the trial court received any information about petitioner's mental condition between June 14, when Sawhill filed his two motions, and November 9, when the court arraigned petitioner on the superseding indictment. On November 9, petitioner's arraignment proceeded routinely; petitioner pled not guilty to both counts of the indictment, exhibiting no evidence of mental or emotional instability.

The first suggestion of a change in petitioner's condition came on December 14, when Sawhill filed a special plea of insanity, challenging petitioner's competence to stand trial. The same day, Sawhill moved the court to appoint an independent psychiatrist, filing the identical motion the court-appointed attorneys had filed on March 2 and he had renewed on June 14. In this motion, as in the earlier ones, counsel predicated his request for psychiatric assistance "on information and belief," but revealed none of the facts that led him to believe that "cer[t]ain psychiatric problems will arise during the course of the preparation and defense of this case." As of December 14, then, the trial judge knew nothing more about petitioner's mental condition than he knew on November 9 or, for that matter, on June 14, except that petitioner's attorney, having filed the special plea, had decided to litigate his client's competence to stand trial. Whether counsel also planned to litigate at trial petitioner's sanity at the time of the offenses remained to be seen.

If petitioner's attorney was planning to raise the insanity defense at trial, he never revealed his plan to the court. Indeed, he bypassed several opportunities to do so. The first opportunity came on December 18, four days after he filed the special plea of insanity and moved the court to appoint an independent psychiatrist, when the court convened a pretrial hearing on that plea. At the hearing, counsel represented that he could not proceed to trial on the special plea without the benefit of another psychiatric examination of petitioner, and he

---

**22.** As we observe in the text accompanying note 10 *supra,* Sawhill filed his supplemental motion requesting funds for a "psychologist and education testing specialist" before inspecting the Forensic Services Division's findings regarding petitioner's mental history. Sawhill never re-

newed the representation he made in his motion, that he believed petitioner to have been insane when the crime occurred, presumably because he reviewed the Division's finding and concluded, as it had, that petitioner was sane at that time.

urged the court to appoint an independent psychiatrist to assess petitioner's competence to stand trial. Counsel said nothing about needing an independent psychiatric examination so that he could decide whether to raise the insanity defense at trial. The court indicated a willingness to appoint a psychiatrist, if the parties could agree on one, and gave them two days to confer about the matter. When they could not agree, the court ruled, on December 20, denying petitioner's motion.

Defense counsel had a second opportunity to inform the court that he planned to rely on the insanity defense at trial—or at least had good reason to believe that he could establish the defense—when, on January 3, 1980, he moved the court to reconsider its December 20 ruling or, alternatively, to have petitioner reexamined at the state hospital. Nonetheless, counsel bypassed this opportunity. The sole purpose for the reexamination, he represented, was to enable him "to adequately and properly prepare for trial [on] the Special Plea of Insanity." On January 17, the court granted the alternative relief counsel sought, ordering that petitioner be reexamined at Central State Hospital to determine his competence to stand trial. On January 23, Dr. Jacobs reported to the court, and counsel, that petitioner had been found competent for that purpose. After he received Dr. Jacobs' report, defense counsel withdrew petitioner's special plea of insanity. At the same time, the prosecutor advised counsel that the State was going to seek the death penalty.

Between his receipt of Dr. Jacobs' report and the commencement of petitioner's trial on February 4, 1980, petitioner's attorney said nothing to the trial judge about needing an independent psychiatrist to explore the possibility of an insanity defense, to develop evidence in mitigation of sentence,[23] or otherwise to assist counsel in preparing for and prosecuting petitioner's defense. And nothing transpired at trial to put the court on notice that psychiatric assistance was necessary.

It becomes clear, therefore, that if the trial court erred in not providing petitioner independent psychiatric assistance, it erred on December 20 when it denied petitioner's December 14 motion for the appointment of a psychiatrist. That motion, as we have noted, replicated the motions petitioner had filed on March 2 and June 14, and sought the appointment of a psychiatrist merely because counsel thought that petitioner would experience "psychiatric problems" as the case progressed toward trial and that a psychiatrist would be necessary to assist in the preparation of petitioner's defense.

We are convinced that the trial court did not err. If psychiatric assistance would in fact have enabled petitioner to prove at the guilt phase of his trial that he was legally insane when he kidnapped and murdered Rhonda Tanner or, after conviction, to present evidence in mitigation of sentence, the error was caused by the conduct of the defense.[24] Petitioner failed to make it rea-

**23.** Petitioner's need to develop mitigating evidence only arose after the State announced that it would seek the death penalty. Had it not sought the death penalty, petitioner upon conviction for murder would automatically be sentenced to life imprisonment. *See* Ga.Code Ann. § 26–1101(c) (Harrison 1977).

**24.** We note that petitioner's counsel have taken inconsistent, though permissible, positions on this point in the various proceedings. On direct appeal, petitioner's trial counsel, John E. Sawhill, III, argued that the trial judge denied petitioner due process and equal protection of the laws by denying his repeated motions for an independent psychiatric examination. In the first state habeas petition, petitioner's new lawyer, Howard J. Manchel, alleged that Sawhill was ineffective in failing to raise the insanity defense and in failing to present adequate grounds for an independent psychiatrist.

In petitioner's first federal habeas petition, Manchel argued that Sawhill rendered ineffective assistance of counsel because he "ignored the insanity defense" and "neglected to seek any psychiatric evaluation concerning Petitioner's state of mind at the time of the crime and offered no evidence at all in defense. Rather counsel only sought an evaluation of Petitioner as to his competency to stand trial." Manchel alleged in a different count of the petition that the trial court unconstitutionally denied petitioner "his motion for an independent psychiatric examination and for funds to hire a psychiatrist or psychologist to serve as an expert witness." In this count, Manchel did not allege, however, that Sawhill had made any sort of

sonably clear to the trial judge why he needed an independent psychiatrist. He never said, much less articulated a factual basis for believing, that his sanity at the time of the offenses would be a significant factor at trial, or that he needed the assistance of a psychiatrist to prosecute his defense, or that a psychiatrist would enable him to present mitigating evidence at his sentencing proceeding. In sum, in denying petitioner's request for psychiatric assistance, the trial judge had no reason to believe that his ruling was likely to deny petitioner a fair trial.

This case is easily distinguishable from *Ake*. In *Ake*, the defendant's behavior in open court was so bizarre that the trial judge, *sua sponte*, ordered him examined by a psychiatrist. *See Ake*, 470 U.S. at 71, 105 S.Ct. at 1090. Then, when the psychiatrist found him to be mentally ill, the court had the defendant hospitalized for psychiatric treatment. After six weeks of drug therapy, the defendant became asymptomatic, and thus competent to stand trial. At a pretrial hearing, the defendant's lawyer informed the court of how he intended to defend his client at trial: he would concede that his client had committed the acts alleged in the indictment and would urge the jury to acquit the defendant on the ground that he was insane at the time he committed those acts. Counsel represented that

he could not prove the defendant's insanity without the assistance of a psychiatrist. Counsel reminded the court that his client had no funds to employ a psychiatrist and that the state psychiatrists could not provide the opinion testimony the defense needed: they had never attempted to determine the defendant's mental state at the time of the offenses.

In this case, the exact opposite occurred. Defense counsel pointed to nothing in the defendant's background or behavioral history to indicate that he may have been suffering from mental or emotional illness at the time the offenses occurred or at any other time. Nor did they point to anything in the defendant's behavior in the presence of the court which suggested that he may be ill. To the contrary, the court observed nothing but normal behavior. Finally, at no time between the return of the superseding indictment and the commencement of trial did defense counsel say anything to the court about presenting an insanity defense[25] or needing a psychiatrist to help him prosecute petitioner's defense or to help him develop or present mitigating evidence.

All that the petitioner presented the trial judge in this case were naked demands for the appointment of an independent psychiatrist.[26] The panel of this court that denied

---

showing of need for psychiatric assistance that would have obligated the trial judge to grant petitioner's motion.

In the second state habeas petition, Manchel asserted that the trial court had unconstitutionally denied petitioner funds for psychiatric assistance and that Sawhill had made the necessary preliminary showing, under *Ake*, that petitioner's sanity at the time of the offense was likely to be a significant factor at trial. Manchel said that Sawhill made the necessary showing by asking for an independent psychiatric examination on two occasions before trial, and he concluded that the factual situation before the trial court, as in *Ake*, "clearly indicat[ed] that sanity would be not only a significant factor at trial but the sole issue in the case."

Petitioner having lost his ineffective assistance of counsel claim in this court, *see Messer v. Kemp*, 760 F.2d 1080 (11th Cir.1985), *cert. denied*, 474 U.S. 1088, 106 S.Ct. 864, 88 L.Ed.2d 902 (1986), pursued only trial court error in his second federal habeas petition. Manchel alleged in that petition that the trial judge unconstitutionally denied petitioner funds to hire an

independent psychiatrist after "[p]etitioner made a preliminary showing that his sanity at the time of the offense was a significant factor at trial." The petition does not describe that showing.

**25.** As we observe in note 13 *supra*, petitioner did request the trial judge to deliver jury instructions relating to his mental condition, but these requests were not made until February 7, the day the court submitted the case to the jury on the issue of guilt.

**26.** Petitioner would have us, in reviewing the merits of his *Ake* claim, consider several documents from the files of Central State Hospital, other than the two letters written to the court by Dr. Jacobs, as well as the affidavit of Dr. Boaz Harris, a psychiatrist. These documents were not before the trial judge on December 20, 1979, when he denied petitioner's December 14 motion for the appointment of an independent psychiatrist, or, for that matter, at any time during petitioner's criminal prosecution. We

petitioner's application for a certificate of probable cause opined that these demands, standing alone, are insufficient, under *Ake*, to require the provision of a psychiatrist. We agree, and accordingly find petitioner's *Ake* claim insufficient.

## IV.

We grant petitioner's application for a certificate of probable cause. We affirm the district court's judgment denying the writ of habeas corpus. We do so because the ends of justice did not require the court to relitigate petitioner's claim that the state trial court denied petitioner a fair trial, in violation of the due process clause, by refusing to provide him an independent psychiatrist.

IT IS SO ORDERED.

FAY, Circuit Judge, concurring in part and dissenting in part.

Most respectfully, I dissent from that portion of the majority opinion finding jurisdiction in our court. As set forth in the procedural history of this matter, a panel of our court denied the requests for a certificate of probable cause and for a stay of execution. Immediately thereafter, petitioner sought and obtained relief in the Supreme Court. On July 9, the Supreme Court granted a stay of execution and set a deadline for the filing of papers. Clearly, the Supreme Court exercised its jurisdiction and "took the case." Almost three weeks later, petitioner filed a petition for rehearing and a suggestion for *en banc* consideration in our court. This was denied on September 5, 1986, without explanation. Four months later, and before the Supreme Court had entered any further orders, our court, *sua sponte*, vacated the order of September 5, 1986 and revisited the matter.

The basis for the majority's finding jurisdiction appears to be 28 U.S.C. § 1651(a)

(1982) and a court's ability to preserve issues for judicial review. While I have no quarrel with the doctrine espoused, I fail to see how the *sua sponte* action of our court was necessary, warranted or authorized when, in fact, all issues in the case were being presented to the Supreme Court in accord with its order accepting the case and exercising its clear jurisdiction over the matter.

In all other regards, I concur in the opinion of Judge Tjoflat.

KRAVITCH, Circuit Judge, dissenting, in which GODBOLD, JOHNSON, HATCHETT and CLARK, Circuit Judges, join:

The majority concludes that James Messer failed to demonstrate to the trial court that he had a substantial basis for his defense of insanity, and thus the trial court was not required by *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), to afford Messer access to an independent psychiatric evaluation. In so concluding, the majority states that we must focus on the information available to the trial judge to decide whether a violation of *Ake* occurred. Because the record demonstrates that the trial judge, the prosecutors, and the defense attorneys all understood Messer's sanity to be the sole significant issue in the case, I conclude that the judge's denial of Messer's motions for an independent psychiatric examination deprived Messer of a fundamentally fair trial, at both the guilt and sentencing stages.

## I

### A.

As this is Messer's second petition for habeas corpus in the federal courts, the district court properly began by considering whether Rule 9(b) of the Rules Governing Section 2254 Cases authorized it to dismiss the petition.[1] The district court

decline to consider these documents, because they are irrelevant in an *Ake* analysis.

1. Rule 9(b) of the Rules Governing Section 2254 Cases in the United States District Courts states as follows:

**(b) Successive petitions.** A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the

concluded that the petition failed to allege new grounds for relief, and that the "ends of justice" did not require it to address the merits. *See Sanders v. United States*, 373 U.S. 1, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963). The district court noted that Messer, in his first petition, had argued that the denial of an independent psychiatric examination violated due process, and that this issue had been decided against Messer on the merits. *Messer v. Kemp*, 647 F.Supp. 1035, 1039 (N.D.Ga.1986) [hereinafter "Dist.Ct.Op."].[2] Because the district court concluded that the "ends of justice" did not warrant relitigation of this issue, it did not consider the merits of Messer's *Ake* claim.

Although, as explained below, the district court misapplied the "ends of justice" standard in this case, it followed the correct procedures under Rule 9(b) in deciding whether it *should* address the merits of the constitutional claim before venturing to do so. The majority, by contrast, addresses the merits without considering whether, applying the "ends of justice" standard, relitigation of Messer's claim is appropriate. Although the majority states that "[b]ecause we conclude, as a matter of law, that the record in this case fails to disclose an *Ake* violation, our 'ends of justice' analysis need not proceed any further," Maj. Op. at 959, this conclusion is indistinguishable from a determination that Messer's successive petition fails on the merits. The majority finds "that the ends of justice did not require the [district] court to relitigate the claim," Maj. Op. at 958, yet itself relitigates the claim, thus confusing the merits of Messer's petition with the district court's discretion to address the merits.

The majority states that its procedure "is analogous" to a court's consideration of a motion for a preliminary injunction, in that a court can deny the injunction after concluding that the moving party cannot pre-

vail on the merits. Maj. Op. at 958 n. 20. There is no support in the case law, however, for importing the four-pronged test for granting preliminary injunctions into the law of habeas corpus. This court has never held that the district courts should make an initial evaluation of the merits of a petitioner's claim in considering whether the ends of justice warrant relitigation of that claim.[3]

Although the district court must consider, in cases such as this one, whether altered circumstances warrant reconsideration of a previously determined claim, such a preliminary determination is not an evaluation of the merits of the case. For example, in the instant case, the district court could have decided that the change in the law represented by *Ake* justified reconsideration of Messer's claim of deprivation of due process but then have concluded on the merits that Messer failed to state an *Ake* claim. The majority's approach avoids the problems inherent in deciding whether the "ends of justice" warrant reconsideration of a claim. Such procedure is contrary to the law of habeas corpus as enacted by Congress and as heretofore interpreted by the Supreme Court and this court.

B.

Once a district court has concluded that a successive petition raises a claim on which there was a prior determination on the merits, it should then decide whether the "ends of justice" nonetheless counsel relitigation of that claim. *Sanders v. United States*, 373 U.S. 1, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963). In *Sanders*, the Supreme Court cautioned that "the test is 'the ends of justice' and it cannot be too finely particularized," *id.* at 17, 83 S.Ct. at 1078, but the Court also identified at least two circumstances in which relitigation would be proper: a showing that the evidentiary hearing in the prior application for habeas corpus was not full and fair; or, if

failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

**2.** *See Messer v. Francis*, No. 82–419R, at 15–16 (N.D.Ga. Mar. 30, 1984), *aff'd on other grounds sub nom. Messer v. Kemp*, 760 F.2d 1080 (11th

Cir.1985), *cert. denied*, 474 U.S. 1088, 106 S.Ct. 864, 88 L.Ed.2d 902 (1986).

**3.** The majority's approach is particularly puzzling in that the majority grants Messer's certificate for probable cause to appeal and thus concludes that Messer's claim is non-frivolous.

purely legal questions are involved, a showing of a change in the law. *Id.* This circuit has indicated that an intervening change in the law, by itself, will usually suffice to warrant relitigation. *See Fleming v. Kemp,* 794 F.2d 1478, 1482–83 (11th Cir.1986); *Witt v. Wainwright,* 755 F.2d 1396, 1397 (11th Cir.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987).

As the majority notes, Maj. Op. 958, purely legal questions are involved in this case. The first issue is whether the Supreme Court's decision in *Ake* constituted a change in the law. Although, before *Ake,* many states *authorized* trial courts to provide for a psychiatric examination of an indigent defendant pleading innocence by reason of insanity, no case before *Ake* had held that the Constitution *required* courts to provide access for indigent defendants to a psychiatric evaluation at the state's expense in cases such as this one. *See Ake,* 470 U.S. at 85, 105 S.Ct. at 1098 (previous decisions by Court do not prevent Court from considering "whether fundamental fairness today requires a different result"); *Tyler v. Kemp,* 755 F.2d 741, 748 (11th Cir.) (under Georgia law before *Ake,* decision to appoint psychiatrist was within discretion of trial court and trial court did not abuse discretion in refusing to so appoint when Tyler or his friends and relatives could have testified), *cert. denied,* 474 U.S. 1026, 106 S.Ct. 582, 88 L.Ed.2d 564 (1985); *Westbrook v. Zant,* 704 F.2d 1487, 1497 (11th Cir.1983) (same). Given the significance of *Ake* as a new development in constitutional law, it seems clear that the ends of justice would require reconsideration of the merits if Messer can demonstrate that his sanity was a significant issue at his trial.

The district court did not analyze the "ends of justice" standard in this fashion. Rather it interpreted the recent Supreme Court case of *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), as supporting its conclusion that the "ends of justice" test requires the district court to balance a multiplicity of factors before deciding whether to permit relitigation on the merits. Applying a balancing test, the district court gave special consideration to Messer's failure to appeal an adverse ruling in his first federal habeas petition on the issue of his motion for independent psychiatric assistance.

However appropriate balancing may be generally in successive petition cases, this court has already explained that a prisoner cannot be faulted for failing to appeal a dismissal of a prior habeas petition at a time when the law did not support his claim. *Fleming v. Kemp,* 794 F.2d at 1482–83. *Johnson v. Wainwright,* 702 F.2d 909 (11th Cir.1983), and *Bass v. Wainwright,* 675 F.2d 1204 (11th Cir.1982), are not to the contrary. In *Johnson,* there had been no intervening change in the law to lead a district court to conclude that the ends of justice would require relitigation. 702 F.2d at 911. In *Bass,* the court noted that the equities were "mitigated somewhat … by the fact that [Bass] did not appeal the decision in the first case," 675 F.2d at 1207, but in that case, the decision of the district court on the first habeas petition had been plainly erroneous on the law *at the time.* Moreover the *Bass* court stated that "Bass may have a justification for failing to appeal," *id.* at 1208 n. 5, and it remanded for a determination on the issue of Bass' failure to appeal.

The district court here also relied erroneously on *Kuhlmann* for its conclusion that Messer's failure to make a showing of factual innocence should outweigh the change in the law represented by *Ake.* Dist.Ct.Op. at 1042–43. In *Kuhlmann,* four Justices of the Supreme Court stated that they would adopt a standard allowing federal courts to entertain habeas claims previously determined adversely to the petitioner on the merits "only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence." 106 S.Ct. at 2627. The adoption of such a standard by a majority of the Supreme Court would effect a major alteration in the law of habeas corpus as it has developed since *Sanders.* But four Justices of the Supreme Court are not a majority, and as yet, the requirement of a showing of factual innocence is not the law of the land.

To be sure, the district court stated in its opinion that it recognized that the requirement of a showing of factual innocence had been advanced by only four Justices, but it relied on Justice Stevens' dissenting opinion in *Kuhlmann* to justify its conclusion that "whether petitioner has made a colorable showing of factual innocence is properly a factor to consider in making the 'ends of justice' determination." Dist. Ct.Op. at 1042. All nine Justices undoubtedly would have agreed that a showing of factual innocence would itself be a factor ordinarily justifying relitigation on the merits. *See Kuhlmann v. Wilson*, 106 S.Ct. at 2627 (plurality opinion); *id.* at 2636 n. 5 (Brennan, J., dissenting); *id.* at 2639 (Stevens, J., dissenting). Indeed, this court has held that *"at a minimum,* the ends of justice will demand consideration of the merits of a claim on a successive petition where there is a colorable showing of factual innocence." (*William Neal*) *Moore v. Kemp*, 824 F.2d 847, 856 (11th Cir.1987) (en banc) (emphasis added). But as I read Justice Stevens' dissenting opinion, it does not support the idea that a *failure* to make a showing of factual innocence should outweigh a significant change in the law, especially a change as remarkable as that in *Ake*, so as to justify dismissal of a successive habeas petition. Even though the presence of a showing of factual innocence may justify redetermination of a claim raised in a successive habeas petition, the absence of such a showing does not preclude relitigation. Accordingly, we should follow the uniform practice of this circuit and hold that a change in the law of the magnitude of *Ake* by itself satisfies the standard of the "ends of justice" so as to require consideration of the claim on the merits.

## II

Having concluded that the district court erred in holding that the ends of justice did not warrant relitigation of Messer's *Ake* claim, I ordinarily would suggest that the appropriate course would be to reverse and remand for further proceedings on the *Ake* issue. As the majority points out, however, the merits of Messer's claim can be evaluated entirely with reference to the record.

I agree with the majority that the key question is what information was before the trial judge when he ruled on the defendant's motion for psychiatric assistance. In my view, however, the majority overlooks several parts of the record and gives too much weight to others. A review of the record and analysis of *Ake*'s requirements convince me that Messer was prejudiced at both his guilt and sentencing phases by the lack of access to an independent psychiatric evaluation.

A.

The majority states, almost in passing, that the prosecutor knew that "the trial judge would be instructing the jury that it could not convict the defendant if it found that he was suffering from a mental disease that prevented him from knowing right from wrong." Maj. Op. at 952 & n. 13 (setting out the trial judge's instructions to jury on issue of sanity). This remark has greater significance than the majority accords it, for it is an established principle of trial procedure that judges may not give instructions to juries on irrelevant issues. *E.g.*, 75 Am.Jur.2d *Trial* §§ 649, 650. In Georgia, as in most states, the giving of an instruction to a jury without any evidence to support the charge is reversible error. *Bland v. State*, 210 Ga. 100, 108, 78 S.E.2d 51, 57 (1953); *Crosby v. State*, 150 Ga.App. 555, 557, 258 S.E.2d 264, 267 (1979). In this case, the reason for such a rule is obvious: if the judge gives an instruction to the jury on a justification or excuse for homicide, the jury may assume that the state has carried its burden of proving all the elements of the offense, except for criminal intent. *Cf. Lewis v. State*, 239 Ga. 732, 733, 238 S.E.2d 892, 894 (1977).

After examining the instructions, one must conclude either that the trial judge gratuitously interjected the issue of sanity into the trial by his instructions, or that the issue was there all along. The record supports the latter conclusion. Messer made his first motion for an independent psychiatric examination on March 2, 1979, only

four days after his indictment. He renewed the motion at the arraignment hearing on May 8, when his attorney told the court, "We feel in a matter of this degree of seriousness and import that another opinion would be warranted and may be helpful to the court and/or to the jury." Tr. of Arraignment at 5. Messer's new attorney moved again for an independent psychiatric evaluation on June 14 and again on December 14.[4]

I readily agree with the majority that Messer's attorneys could have added more particulars in their motions for psychiatric assistance. *But cf. Messer v. Francis,* No. 82–419R, Magistrate's Report and Recommendation at 45–46 (concluding that Messer's attorneys were not ineffective on this issue), *adopted, Messer v. Francis,* No. 82–419R, at 3 (N.D.Ga. Mar. 30, 1984), *aff'd on other grounds sub nom. Messer v. Kemp,* 760 F.2d 1080 (11th Cir.1985), *cert. denied,* 474 U.S. 1088, 106 S.Ct. 864, 88 L.Ed.2d 902 (1986). We should bear in mind, however, that Messer's trial took place several years before either *Ake* or *(Carzell) Moore v. Kemp,* 809 F.2d 702 (11th Cir.) (en banc), *cert. denied,* — U.S. ——, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987), even began to establish what a defendant must show, by manner of affidavits or testimony, to obtain independent expert assistance. More importantly, a review of the record in its totality, including Messer's confession that he had committed the act and the fact that Messer had never before been arrested for any offense, supports the

conclusion that, from beginning to end, the *only* significant issue at the guilt phase of the trial was Messer's sanity. Indeed, the bizarre nature of the crime (which was widely reported in local newspapers, excerpts of which were presented to the trial judge in motions for change of venue)—the murder of a beloved niece who showed such complete trust in Messer as to leave school with him on the afternoon of the murder—raises a substantial question as to Messer's sanity. *Cf. Blake v. Kemp,* 758 F.2d 523, 529–30 (11th Cir.) (question as to defendant's sanity obvious in case in which defendant had thrown daughter of his fiancee off a bridge and had told the examining psychiatrist that he would meet the victim "on the other side ... [where] she is waiting for me"), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985). Although Messer, unlike Ake, may not have been raving in open court, the newspaper accounts of his out-of-court actions, coupled with the representations of counsel should have alerted, *and did alert,* the court to concerns about Messer's sanity.[5] And *Ake* requires that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial," the defendant must have access to a psychiatrist. *Ake,* 470 U.S. at 83, 105 S.Ct. at 1097.

Any doubts on this issue are resolved by the prosecutor's closing argument, which focused exclusively on the issue of Messer's sanity.[6] If the issue of sanity had been irrelevant to the case, Messer's attor-

---

**4.** I would assign no significance to what the majority apparently considers quite significant, that Messer's attorneys phrased their motions in terms of "information and belief." Maj. Op. at 962. To me this is harmless legalese that the defense attorney may have used because he was unsure about what phraseology to use.

**5.** It is particularly ironic that the majority struggles to resist the conclusion that the trial judge knew enough to cause him to rule on the issue of a psychiatric examination when, in fact, the trial judge held a hearing on the issue, did rule on the necessity of a psychiatric examination, and ordered that one be held. It seems bootless to argue over whether the trial judge had sufficient reason to cause him to do something when he actually did it. Although the majority may not believe that the facts within the trial judge's

knowledge were sufficient to require a psychiatric examination, the trial judge apparently thought that they were.

**6.** The following is the text of the prosecutor's closing argument to the jury:

BY MR. SAMMONS

May it please the court, ladies and gentlemen of the jury, you heard Mr. Foster get up here when we started this case and discuss with you what he expected the evidence to show. At this time on behalf of the State it's my opportunity to relate to you what the State believes the evidence has shown in this case.

Ladies and gentlemen, we believe that the evidence has shown that on the afternoon of the 13th of February 1979 this defendant, James Messer, spent a good portion of the afternoon stalking Retha Wood at Barber's

Supply here in Cedartown. Now, here's a photograph of Barber's Supply from the air. Barber's Supply is here and here's the school over here. Now, at two thirty five, or thereabouts, Retha Wood who has identified the defendant's photograph saw the car go by again, after he had already been there twice before that day, she saw the car go by and the tag number on it RUP 779, the defendant's car. She knows it was around two thirty because the school guard was at the crossing down there, and what does Mr. Messer do. Well, before Mr. Messer drives there past Barber's Supply she's already seen him for a total of about an hour that day, fifteen or twenty minutes before lunch and about thirty or forty minutes after lunch. And what does he do ladies and gentlemen, he comes in and he converses with her, she doesn't have any difficulty understanding him, he's able to operate an automobile without any difficulty, and tells her his story about his need to get some electrical supplies out of the back of the store, they were talking about the back of the store. Nothing abnormal in his behavior. He drives his car without any difficult over to College Street Elementary School and what does Mr. Brabson say the defendant did after he got there. Mr. Brabson whose job it is to educate and care for the children that are under his control there at the school. How bizarre did the defendant appear to him?

Mr. Brabson was seated at his desk and the defendant comes in and walks over to Mr. Brabson's desk and tells him the story about Rhonda's daddy. Mr. Brabson, what does he say? He did not have any difficulty understanding what he wanted. So Mr. Brabson what, if anything, did he do to cause you any concern? Not a thing. He made up his story, told him what he wanted Mr. Brabson to do and then stood there patiently and waited, not calling any attention to himself, just stood there and waited. Again nothing out of the ordinary exhibited by the defendant.

Now, Rhonda is at school, she had left that morning. Rhonda was eight years old, and Rhonda who did not easily cotton to strangers, she was a very shy child according to Mr. Brabson and according to Ms. Williams, her teacher, talked about how she cried, how she was afraid her mother would not be home when she got there. That further ... her disposition further created in the minds of the people there at the school that nothing was amiss because what was Rhonda's reaction when she approached the defendant. Mr. Brabson says she came up and took his hand and rubbed it. Rhonda would not do that to someone she didn't know, someone that she didn't feel comfortable with. And what does Pricilla Lay, say who was waiting there to pick up her great niece, what was Pricilla Lay's observation about Rhonda's reaction about how Rhonda was, I believe as Mrs. Lay said, prancing there in the hall, excited to be

with him, the defendant. What does Mrs. Williams say that were the last words that she heard Rhonda speak? "Mrs. Williams, I don't have to ride the bus today. My daddy's been hurt on the job in Warner Robbins and my uncle is here to take me home." My uncle. She runs back and grabs his hand and with her Bunny Ride book and leaves the school. Again the defendant is able to conduct himself in a fashion that doesn't create any suspicion, he's able to operate his automobile, to drive over to Golf Course Road, and tells Rhonda the story about his battery cable. Rhonda is with her uncle, no reason to suspect anything, and so they do, they go out and they look for this rock, the defendant and Rhonda, and they make their way into the woods, the defendant and his niece whom he loved like a daughter, according to what he told the agents. And he wanted to play a game with her. Now, a game to the defendant that was probably something Rhonda could not understand, could not understand because she was with her uncle.

And so he does, he starts to play his game with her and Rhonda objects, she cries, and he beats her, he beats her until she falls down to the ground and he chokes her, he plays his game, and then pulls her pants off and does what he's going to do while she lays there crying, the little girl that he says he loved like a daughter, and then ladies and gentlemen he takes his knife and stabs her, and he stabs her, and he stabs her, and then he slashes her, and he leaves her there in the woods, as Dr. Dawson said, to bleed to death.

Now, how could ... I'm sure you'll ask yourselves, how could any human being do that to another unless they were crazy. Well, ladies and gentlemen, when you consider that I suggest that you examine the defendant's ability to remember what he did in such graphic detail, ladies and gentlemen. The defendant who can remember the dead dog laying there on the tracks where he left the tracks to take Rhonda into the woods. And let's examine the defendant's behavior, ladies and gentlemen, after he left Rhonda to bleed to death. What is the first thing that he does, ladies and gentlemen? Ladies and gentlemen, he gets back to his car and he takes this coat, Rhonda's coat, and he throws it in the bushes. Well, why does he do that ladies and gentlemen? And why does he take Rhonda's Bunny Ride book and throw it into the bushes? And why does he take Rhonda's crayons and throw them into the bushes? Because, ladies and gentlemen, he is going home. Rhonda is his wife's twin sister's daughter. The defendant's wife knows Rhonda's coat. The defendant's wife knows Rhonda's crayons. He's disposing of the evidence that will connect him with the crime ladies and gentlemen. And what does he do with his knife, ladies and gentlemen? You heard the crime lab expert, Mrs. Quarrels, testify about how there was

ney undoubtedly would have moved immediately for a mistrial—a tactic that he had used before in the trial. In addition the closing argument of Messer's attorney, which the majority characterizes as an appeal to the jurors' "common sense," Maj. Op. at 953, is comprehensible *only* if it is read as an appeal to the jurors' common sense in that a rational person could not have committed the acts described in the case. Messer's attorney practically conceded that the prosecution had shown that Messer had committed the act. Unless we are to conclude that the attorney's closing argument was constitutionally defective, which this court previously has decided was not the case, *see Messer v. Kemp*, 760 F.2d at 1090–91, there is no way of explaining the defense attorney's closing argument, or the prosecution's closing argument, or the judge's instructions to the jury, except as a ratification and acknowledgment that Messer's sanity was at issue.

B.

Not only was independent psychiatric assistance essential to enable Messer to present his defense of insanity at the guilt phase; it was equally necessary for Messer to present a meaningful case for mitigation at sentencing. In a capital case, evidence of emotional instability or mental aberration can be a potent mitigating factor in the jury's determination of whether to impose the death penalty, even if the jury is not convinced that a defendant's mental illness is sufficiently severe to disable him from distinguishing between right and wrong, the Georgia standard for establishing mental incapacity to form criminal intent. *Ga. Code Ann.* § 16–3–2 (1984). The trial judge was informed that Messer had a need to present psychiatric testimony at his sentencing phase, for Messer's counsel stated as one of the grounds for the appointment of a psychiatrist the relevance of mental illness as a mitigating circumstance under state law, and all the facts and issues known to the trial judge with respect to Messer's defense of insanity applied *a fortiori* to the possibility of establishing mental illness or insanity as a mitigating factor. The denial of access to independent

some traces of blood down in the joint of the blade. He washed the knife off. Is that a sane act ladies and gentlemen?

What does he do with his shoes ladies and gentlemen? The shoes that he was wearing when he stomped Rhonda's face. He washes them off too. Again what does the crime lab say? Traces of blood. Nothing else because the defendant is trying to obliterate the evidence of what he had done.

And that's not all ladies and gentlemen. The defendant has on this cap, this cap that he was wearing when he picked Rhonda up. You've noticed the cap. You'd remember a cap like that ladies and gentlemen. That thought too crossed the defendant's mind because as he was driving down Old Mill Road toward his house he stopped and throwed that cap into the creek ladies and gentlemen. That's his cap because they found it where he said it was. And Mr. Sims from the crime lab tells you about how the defendant's hair matches the hair that's in that cap.

Again, ladies and gentlemen, it's a sane act on the part of the defendant. And then continuing his masquerade ladies and gentlemen the defendant spends the evening of the 13th of February with Rhonda's bewildered and grief stricken parents, who don't know what's happened to Rhonda, camouflaged there among the shocked parents. He goes over to the victim's mother and puts his arm around her shoulder and tells her "I know how you feel sis." How could he? The acts of a sane man ladies and gentlemen are the acts of a man who was concealing his crime.

And ladies and gentlemen, the portrait that I have painted you about Rhonda's faith comes largely from the own words of the defendant, the defendant that couldn't remember at all as he did it and after he did it. And what did he do for the officers, ladies and gentlemen, this individual who would like you probably to believe he was insane, he was able to take an ink pen and draw out the route for Officer Leary, draw out the route that he traveled with Rhonda on their Bunny Ride together. Is this again the acts of an insane man ladies and gentlemen?

What then, ladies and gentlemen, has the evidence shown? The judge is going to charge you on reasonable doubt ladies and gentlemen. Where is the reasonable doubt in this case? Ladies and gentlemen reasonable doubt in this case has been trampled under the weight of the evidence against this defendant, James Messer, who is sitting over there with his head on his hands.

Ladies and gentlemen, I stand before you today and tell you that the evidence in this case leaves no doubt in your mind that the defendant in this case took that little girl, ladies and gentlemen, and ladies and gentlemen he reduced her to that. And what should your verdict be, ladies and gentlemen, but guilty. Thank you.

psychiatric assistance eliminated any possibility that Messer could present testimony by a competent psychiatrist to support mitigation at his sentencing phase.

The denial of psychiatric assistance effectively tipped the scales at sentencing in the state's favor, for the state had introduced evidence at trial that would support aggravating circumstances—most significantly, evidence of the brutality of Messer's attack on his niece. Without the assistance of a psychiatrist, Messer had little opportunity to raise doubts in the jurors' minds about the motivation, or explanation, for such brutality. A psychiatrist testifying on Messer's behalf could certainly have offered explanations for Messer's actions and could have given an opinion as to Messer's future dangerousness. Messer's indigency prevented him from having the opportunity to present any such evidence, however, and I "do not see why monetary considerations should be more persuasive in this context than at trial." *Ake,* 470 U.S. at 84, 105 S.Ct. at 1097.

In my opinion, therefore, Messer's requests for access to psychiatric assistance were sufficient to satisfy *Ake.*

### III

As a result of the trial judge's denial of Messer's motions for psychiatric assistance, Messer had nothing in the manner of testimony by competent professionals to present to the jury on the issue of his sanity, at the guilt phase or the sentencing phase of his trial. It was precisely this kind of situation that the Supreme Court hoped to redress in *Ake. See Ake,* 470 U.S. at 72, 105 S.Ct. at 1091 ("*As a result, there was no expert testimony for either side on Ake's sanity at the time of the offense*") (emphasis in original).[7] As the *Ake* Court stressed, an insanity defense without *medical* testimony on the issue of

sanity is an empty defense; lay witnesses cannot evaluate a person's mental health with the competence of professional psychiatrists. This is not to suggest that psychiatrists are infallible. Nonetheless, psychiatrists can assist lay jurors in making an "educated determination" about a defendant's sanity in a way that lay witnesses cannot. *Id.* at 81, 105 S.Ct. at 1096. Lay witnesses are frequently unable to describe the defendant's behavior or mental state with greater precision than "He acted like a crazy person" or "She looked normal," evaluations that may be grossly incorrect given the deceptive symptoms of mental illness. *Id.* at 80, 105 S.Ct. at 1095. The assistance of a psychiatrist is crucial to the successful establishment of the insanity defense. *Id.*

Nor did Messer's examination by doctors at the Central State Hospital at Milledgeville, upon motion by the state, satisfy the requirements of *Ake.* I do not mean to impugn the competence or integrity of the psychiatrists at Milledgeville; *Ake* simply requires something different. In *Ake,* the Supreme Court stated:

This Court has upheld the practice in many States of placing before the jury psychiatric testimony on the question of future dangerousness, see *Barefoot v. Estelle,* 463 U.S. 880, 896–905 [103 S.Ct. 3383, 3396–3401, 77 L.Ed.2d 1090] (1983), at least where the defendant has had access to *an expert of his own, id.,* at 899, n. 5 [103 S.Ct. at 3397, n. 5]. In so holding, the Court relied, in part, on the assumption that the factfinder would have before it both the views of the prosecutor's psychiatrists and the "*opposing views of the defendant's doctors* " and would therefore be competent to "uncover, recognize, and take due account of ... shortcomings" in predictions on this point. *Id.,* at 899 [103 S.Ct. at 3398]. Without a psychiatrist's assist-

7. Arguably this case is more compelling than *Ake,* where there was no expert testimony for either side. Here, there was expert testimony available to the state—the two examinations by the psychiatrist at Milledgeville. Messer thus faced trial and sentencing not only without any expert testimony on the most crucial issues but with the knowledge that the only expert testimo-

ny the jury could possibly hear would be helpful to the state. That the state's evidence of sanity was never offered does not matter; it was not offered because Messer had nothing in the way of psychiatric testimony to offer. Messer had nothing to offer because he was indigent and had not obtained the relief from the trial court required by *Ake.*

ance, the defendant cannot offer a well-informed expert's opposing view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the State's proof of an aggravating factor. In such a circumstance, where the consequence of error is so great, the relevance of *responsive psychiatric testimony* so evident, and the burden on the State so slim, due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase.

*Ake*, 470 U.S. at 84, 105 S.Ct. at 1097 (emphasis added). The *Ake* Court based its holding on the usefulness of responsive psychiatric testimony in the adversary situation of a criminal trial. A defendant needs access to an "expert of his own" because of the superior ability of professional psychiatrists to organize a defendant's mental history and behavior and to interpret the same for the factfinder. Messer's defense attorney precisely identified the reason for an independent psychiatric examination when he told the court that another opinion would be helpful to the jury: "[T]he psychiatrists for each party enable the jury to make its most accurate determination on the issue before them." *Ake*, 470 U.S. at 81, 105 S.Ct. at 1096. Messer's examination by the Milledgeville psychiatrists did not advance the adversary process, and Messer should have had an opportunity to consult with his own psychiatrist and to have something—some competent testimony by a psychiatrist—to present to the jury on the issue of his sanity.

For these reasons I respectfully dissent.