872 F.2d 966
 1989-1 Trade Cases 68,585
 FEDERAL TRADE COMMISSION, Plaintiff-Appellee,
v.
ATLANTEX ASSOCIATES, Dunn Petroleum, Inc., Petro Fund
Corporation, Jaset Petroleum, Inc., Stephen
Tashman, Michael Dundee, Archie Tashman,
James Settembrino, Ernest
Lockamy,
Defendants-
Appellants.
 No. 87-6106.
 United States Court of Appeals,
Eleventh Circuit.
 May 15, 1989.
 
 Andrew C. Hall, Hall & O'Brien, Miami, Fla., for defendants-appellants.
 Truett M. Honeycutt, Harold E. Kirtz, Atlanta, Ga., Ernest J. Isenstadt, F.T.C., Joanne Levine, Washington, D.C., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before KRAVITCH and HATCHETT, Circuit Judges, and MARKEY*, Chief Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 The Federal Trade Commission ("FTC") brought this action for consumer restitution under sections 5(a) & 13(b) of the Federal Trade Commission Act, 15 U.S.C. Secs. 45(a), 53(b), against defendants-appellants Atlantex Associates ("Atlantex"), Dunn Petroleum, Inc. ("Dunn"), Petrofund Corp. ("Petrofund"), Jaset Petroleum, Inc. ("Jaset"), Stephen Tashman, Michael Dundee, Archie Tashman, James Settembrino, and Ernest Lockamy for deceptive trade practices in conjunction with appellants' promotions and sales of partnership interests in oil and gas ventures and in a "Teen Disco." After a bench trial, the district court ordered restitution in the amount of $12,175,250.00 and enjoined appellants from carrying on similar activities in the future. We affirm.
 
 I. FACTUAL BACKGROUND
 
 2
 Atlantex was an unincorporated association that sold investments in oil and gas drilling ventures and in a teen discotheque. Petrofund is Atlantex' corporate successor. Atlantex and Petrofund recruited investors and coordinated the formation of drilling partnerships that, in turn, contracted for drilling and development of oil and gas sites. Dunn is a Florida corporation that leased all the drilling sites and performed all drilling services for partnerships organized by Atlantex. Jaset is a Florida corporation that leased all drilling sites and provided all drilling services for partnerships organized by Petrofund. Defendants Stephen and Archie Tashman, Dundee, Settembrino and Lockamy acted as officers, and/or sales representatives for one or more of the aforementioned entities.
 
 
 3
 Atlantex and Petrofund recruited investors by purchasing address lists and conducting mass mailings. The "lead" mailings asked consumers to complete and return "lead" cards. Salesmen then made "front calls" to potential customers. During such calls, salesmen would screen potential customers for investment interest and financial capability. A sales brochure, a partnership agreement, a signature page, and a map of the lease area then would be sent to each potential investor. Later, a salesman would make "drive" calls, the principal oral sales presentations, which recited printed sales scripts in order to complete sales of partnership interests. When enough investors signed on to capitalize a particular program, a partnership would be formed, a managing partner would be elected, and a drilling contract would be concluded with Dunn or Jaset. Appellants employed similar methods to solicit investment in a "Teen Disco" partnership. Consumers invested $11,350,250 in Atlantex and Petrofund oil schemes and $825,000 in Teen Disco.
 
 
 4
 The FTC commenced this action on January 12, 1987 by filing a complaint, which alleged that appellants had sold partnership interests by employing deceptive trade practices, and a motion for an ex parte temporary restraining order, which sought to freeze the assets of all defendants in order to preserve a pool of funds for eventual consumer restitution. The district court granted the TRO, which provided, in part:
 
 
 5
 IT IS FURTHER ORDERED that, notwithstanding the [freezing of defendants' assets], that individual defendants Stephen Tashman, Michael Dundee, Archie Tashman, James Settembrino, and Ernest Lockamy may withdraw an amount no greater than $400.00 per week from their personal funds for their personal living expenses. Defendants may apply to the Court, after notice of three (3) business days to the Federal Trade Commission, for permission to make further withdrawals for reasonable personal or business expenses upon a proper showing of necessity.
 
 
 6
 After a hearing, which was held on January 21, 1987, the court extended the TRO and ordered consolidation of the hearing on the FTC's motion for a preliminary injunction and the trial on the merits. On November 25, 1987, the district court entered its final judgment, concluding that defendants-appellants used various misrepresentations to induce consumers to invest in their partnership ventures and that those misrepresentations constituted deceptive trade practices for which the defendants were jointly and severally liable.
 
 
 7
 Specifically, although Dunn and Atlantex were represented as separate, independently operating companies conducting business at arms length, the district court found: (1) that Stephen Tashman, who was the treasurer of Dunn, was a key decision maker of both Atlantex and Petrofund who hired and fired Atlantex salespeople, attended Atlantex sales meetings, wrote the Atlantex drive script, and helped to draft the Petrofund sales brochure; (2) that defendant Dundee, who was the president of Dunn, also participated in Atlantex activities, attended sales meetings, did "feeds" and made "in the mail calls," using the name Mike Sawyer to assure consumers that profit-distribution checks were "in the mail;" (3) that Settembrino, ostensibly of Atlantex, also performed duties for Dunn, such as representing Dunn in discussions and negotiations with geologists; (4) that Dunn and Atlantex occupied the same suite and shared a common reception room, common hallways and a common kitchen at an address used on the tax returns of each company.
 
 
 8
 The court also found that, although appellants represented that Atlantex would not receive any money from the partnership wells until investors had recovered their initial investments, Atlantex made considerable sums before the partners received any profits, as it retained from 35% to 40% of the partners' capital investment as "organizational fees and administrative costs." Further, the court found that actual production and resulting income were far less than promised, as income predictions presented to consumers were based upon obviously unrealistic production forecasts. Moreover, although the court found that Atlantex salesmen told prospective investors that Atlantex eliminated the risks of oil exploration by carefully selecting drilling locations, drilling a second or third well, studying reserve reports, and employing the most capable drillers with the best equipment, the court found also that oil drilling can never be risk free, as dry holes can occur, reserve reports are, at best, informed estimates, and mechanical problems, or other production-stopping or delaying events, may occur. Additionally, the court found that consumers were led to believe that wells drilled for partnerships in which they had invested were successful but that these representations frequently were made at the same time (or shortly before) consumers were urged to invest in new partnerships. The court found that, despite the failures of some wells, Settembrino informed investors that the wells were great successes.
 
 
 9
 The court found that Stephen Tashman and Settembrino solicited consumer investments in Teen Disco by representing that the project presented almost no risk to investors and that it would sell sixty franchises in eighteen months at a price of $50,000 per franchise, returning consumers' entire investments in less than one year. The court found that only one franchise actually was sold, and that, in December 1986, after eleven months of operation, Stephen Tashman, who owned no partnership interest in Teen Disco, terminated the business. The court found that the Teen Disco partners lost almost all of their investments.
 
 
 10
 In light of its findings, the district court enjoined appellants from engaging in similar enterprises in the future and ordered appellants to pay consumer restitution of $12,175,250, an amount equal to the total consumer investment in the oil and Teen Disco schemes. This appeal followed.
 
 II. DISCUSSION
 
 11
 Appellants' primary contention is that the district court denied them due-process of law by failing to exempt from its pre-judgment, asset-freeze order sufficient funds to enable them to hire geological and accounting experts to aid in preparation of a defense and to testify at trial. They also assert that the court abused its discretion by failing to hold a separate trial to determine the proper amount of consumer restitution and by failing to set off certain sums against the amount of restitution ordered. Finally, appellants argue that the district court's respective findings that each defendant engaged in deceptive trade practices are clearly erroneous. We deem only the due-process argument to require extended discussion.[1]
 
 
 12
 At the outset, we note that the district court modified its original freeze order to allow payment of defense counsel of appellants' choice. Although the hourly rate approved by the court was less than that customarily charged by appellants' lawyers, appellants do not now challenge the amount of the fees allowed and do not contend that they were denied counsel of choice or that counsel performed inadequately. Instead, appellants' contention is similar to the sixth-amendment claim recognized in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In Ake, the Supreme Court held that, although the indigent criminal defendant-appellant was represented at trial by competent court-appointed counsel, that representation was rendered constitutionally ineffective by the trial court's failure to appoint a psychiatrist to help prepare Ake's defense and to testify at trial. Because Ake's indigency prevented him from hiring the psychiatric expert necessary to mount an effective defense, the Court concluded, the sixth-amendment's guarantee of effective assistance of counsel required the State to provide such an expert.
 
 
 13
 Here, appellants do not cite Ake explicitly, but their argument is closely analogous. First, they claim that they were made effectively indigent by the district court's ex parte asset-freeze order. Then, relying on Potashnick v. Port City Construction Co., 609 F.2d 1101, 1117-20, reh'g denied, 613 F.2d 314 (5th Cir.), cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980), appellants contend that, although civil litigants have no right to appointed counsel, the fifth amendment guarantees to civil litigants the right to the effective assistance of retained counsel of choice. They argue that this right to effective representation includes the right to utilize expert testimony whenever necessary to apprise the finder of fact of the correct interpretation of complex, technical facts. They conclude that the district court's failure to exempt from the freeze order sufficient funds to allow appellants to acquire the services of the geological and accounting experts necessary to mount an effective defense in this factually complex case denied them due-process of law.
 
 
 14
 Appellants overlook one crucial point: Even if we accepted their theory regarding the scope of their fifth-amendment rights, appellants would be entitled to a reversal of the district court's judgment on this ground only if they had requested and been denied access to their frozen assets for the expressed purpose of hiring experts whose testimony at trial had been shown to the district court to have been reasonably necessary to establish a material fact. The record shows that appellants never requested the release of funds for the purpose of hiring expert witnesses.[2] Much less did they offer to demonstrate to the district court that the testimony of any expert was reasonably necessary to establish a material fact.[3]
 
 
 15
 When questioned at oral argument about appellants' failure to move the district court for release of funds with which to acquire the services of experts, counsel attempted to excuse their failures by suggesting that due process required the district court sua sponte to exempt from its asset-freeze order sufficient funds to allow appellants to explore the possibility of using expert testimony. According to counsel, appellants needed the services of experts to tell them whether expert testimony at trial would be required. This Catch-22, counsel argued, prevented appellants from demonstrating ex ante that they needed the experts and, thus, excused their failure to do so.
 
 
 16
 Appellants' argument fails for at least two reasons. First, it may be that counsel would not know whether expert testimony would be helpful before consulting such an expert, but this argument could have been made to the district court in support of a motion to release funds to investigate the need for experts. Such an argument was not presented to the district court--even though, as noted supra, at 968, the TRO explicitly provided a procedure for seeking relief from the freeze order.[4] Second, acceptance of appellants' theory--that the district court's freeze order should have specifically exempted expert witnesses' fees--would undermine the adversary system by placing on the district court the responsibility of suggesting possible avenues of defense. Even in the criminal context, where the right to effective assistance of counsel is at its zenith, it is up to the defendant to request appointment of an expert--the court need not raise the issue sua sponte. See Caldwell v. Mississippi, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985) (no deprivation of due process by trial judge's denial of appointed expert where "petitioner offered little more than undeveloped assertions that the requested assistance [of criminal investigator, fingerprint expert, and ballistics expert] would be beneficial"); Stephens v. Kemp, 846 F.2d 642 (11th Cir.) (defendant who failed to explain how appointment of ballistics expert would be relevant to defense not denied fair trial by court's refusal to appoint expert), reh'g denied, 849 F.2d 1480, cert. denied, ---- U.S. ----, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988); Messer v. Kemp, 831 F.2d 946 (11th Cir.1987) (en banc) (no constitutional deprivation where petitioner failed to make it reasonably clear to trial judge why he needed an independent psychiatrist or to indicate factual basis for believing that sanity at the time of offense would be significant factor at trial or to show that psychiatrist was necessary to present defense or that psychiatrist would enable presentation of mitigating evidence at sentencing), cert. denied sub nom. Messer v. Kemp, --- U.S. ----, 108 S.Ct. 1586, 99 L.Ed.2d 902, reh'g denied, --- U.S. ----, 108 S.Ct. 2859, 101 L.Ed.2d 896 (1988); Moore v. Kemp, 809 F.2d 702 (11th Cir.) (en banc) (to be appointed expert assistance, indigent criminal defendant must show trial court that reasonable probability exists both that expert would be of assistance and that denial of expert would result in fundamentally unfair trial), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).
 
 
 17
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Howard T. Markey, Chief U.S. Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 After carefully reviewing the record, we cannot say that the district court's findings--that each of the defendants engaged in deceptive trade practices--are clearly erroneous. Further, nowhere does the record reflect that appellants either requested a separate trial on the amount of restitution or filed proposed findings of fact and conclusions of law as requested by the district court. In fact, the record does not disclose that appellants so much as filed a response to the FTC's proposed findings and conclusions. Moreover, even if such requests had been made, given that it was within the district court's discretion to award pre-judgment interest from the date of each investor's contribution, that calculation of such pre-judgment interest would have been extremely difficult, that, in any case, such interest certainly would have exceeded the $602,848.25 appellants' exhibits suggest was returned to investors, we conclude that the district court did not abuse its discretion either by failing to hold a separate trial on the amount of restitution or by ordering restitution of the entire investment of $12,175,250.00 without pre-judgment interest
 
 
 [2]
 Appellants did request funds for an accountant--but not to testify at trial. They requested and received funds to hire an accountant to prepare an accounting of funds subject to the freeze order
 
 
 [3]
 Appellants have argued to this court that a geologist's testimony was necessary to support their contention at trial that the leases contained sufficient oil and gas to justify their representations to consumers. As the district court found, however, appellants had in their possession reports that belie this contention. Thus, the relevant question was not whether sufficient oil was there--but whether, given the information available to them at the time, defendants can be said to have misled or deceived consumers as to what defendants themselves believed to be true. A geologist could not have spoken to this issue as an expert
 
 
 [4]
 Indeed, during the course of the litigation, appellants used this procedure to obtain release of attorneys' fees and other sums